UNITED STATES of America,
Plaintiff–Appellee,

v.

Mervyn Harold CROSS a/k/a Eric
Cross, and Robert Carter Lodge,
Defendants–Appellants.

No. 86–3344.

United States Court of Appeals,
Eleventh Circuit.

April 16, 1991.

1032

Catherine McWilliam–Rinaldo, Tampa, Fla., for Lodge.

Terrance Bostic, Marie Tomassi, Tampa, Fla., for Cross.

Fran Carpini, Asst. U.S. Atty., Tampa, Fla., Karen Skrivseth, Attorney, Crim. Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

Before FAY and KRAVITCH, Circuit Judges, and THOMPSON*, District Judge.

MYRON H. THOMPSON, District Judge:

Appellants Mervyn Harold Cross and Robert Carter Lodge were each indicted in November 1984 by a federal grand jury in Tampa, Florida, on one count of conspiracy to persuade a minor to engage in sexually explicit conduct for the purpose of producing visual or print media, 18 U.S.C.A. §§ 371 (1966) and 2251 (1982); one count of mailing obscene material, 18 U.S.C.A. § 1461 (1984); and 18 counts of mail fraud, 18 U.S.C.A. § 1341 (1984). After a jury trial, Cross was convicted on all counts with the exception of one count of mail fraud, and Lodge was found guilty on only the conspiracy charge.

The evidence at trial showed that between 1980 and 1983, Cross and Lodge, together with co-defendant Ruksana Diwan, conspired to exploit children sexually in order to produce and sell child pornography.[1] Cross, while a prison inmate in Florida, orchestrated a fraudulent scheme to obtain nude photos of child models from the Tampa, Florida area by falsely portraying himself as a film producer and misrepresenting that the pictures were necessary for casting decisions for a legitimate educational documentary. Lodge, who, like Cross, was a pedophile interested in pre-adolescent girls, used a lab in his Seattle, Washington home to develop these pictures as well as obscene photos of two California children which Cross arranged for him to receive in the mail. Diwan assisted by placing telephone calls, directing mail, and serving as a Florida contact for Cross.

Cross and Lodge have appealed their convictions on a multitude of grounds: co-conspirator hearsay, immunity, denial of a continuance, prosecutorial misconduct, sufficiency of the evidence, improper jury instructions, unduly prejudicial evidence, recanted testimony, a false search warrant affidavit, and refusal to sever.[2] We now affirm.[3]

---

* Honorable Myron H. Thompson, U.S. District Judge for the Middle District of Alabama, sitting by designation.

1. Diwan was also indicted for conspiracy and mail fraud and was originally scheduled to be tried jointly with Cross and Lodge. However, she failed to appear for trial. Diwan was eventually extradited from England and entered a conditional guilty plea in October 1987. This court affirmed her conviction. *United States v. Diwan*, 864 F.2d 715 (11th Cir.) (per curiam),

cert. denied, 492 U.S. 921, 109 S.Ct. 3249, 106 L.Ed.2d 595 (1989).

2. Cross filed his initial appellate brief in this court *pro se*. However, subsequently, an attorney was appointed to represent him and filed a supplemental brief. We address the issues raised in each brief.

3. We consider separately each of appellants' claims of error. However, because we find no

## BACKGROUND

Cross and Lodge began their association in 1975 when Lodge responded to an advertisement by Cross's mail order company, "Cine International," offering "erotic" photographs of children. Cross and Lodge soon started to exchange such pictures and share accounts of their sexual experiences with children. In 1978, the two men, through letters and phone calls, began to discuss a series of proposed ventures for producing and marketing child pornography. Cross offered to arrange several opportunities for Lodge to take sexually explicit photos of pre-adolescent girls. In return, Lodge would process the film and send the pictures to Cross, who would sell the photos and share the profits with Lodge. Lodge expressed to Cross his interest in several of these ventures and at least one such photo session was arranged but had to be cancelled at the last minute when a woman, whose two young daughters Lodge had intended to pay to pose nude, telephoned Lodge's home and mistakenly mentioned the plan to Lodge's wife.

In 1980, Cross recruited Lodge for a scheme that involved sending obscene materials through the mail. Several years earlier, Cross had begun communicating with Elmer Donald Woodward concerning "their mutual interest in child pornography."[4] On several occasions, Woodward mailed to Cross the negatives of obscene photographs of a seven-year old California girl and her younger brother. Cross indicated to Woodward that Lodge could develop the pictures for a reasonable fee, and offered to pay for the film processing himself if he also could receive a set of prints. Cross subsequently arranged for his attorney to mail the Woodward negatives to Lodge. Both the negatives and black and white prints of the photos were later discovered during a search of Lodge's home in May 1983.

In 1981, Cross and Lodge, this time with Diwan's assistance, initiated a new attempt to obtain nude photographs of children and market them as child pornography by means of an elaborate confidence game in which the parents of child models in the Tampa, Florida area were misled into believing that Cross was an independent movie producer who required such pictures in order to make casting decisions for a new film.[5] Using a dummy corporation as a front, Cross contacted a Tampa talent agency, and requested and received composite photographs and resumés of actresses between the ages of eight and twelve.[6] Cross informed the head of the agency that he was looking for a young girl to star in an educational documentary he was producing, and indicated that because it might involve some nudity, the agency should inform him as to which children did not suffer from "modesty problems."[7]

Cross contacted the parents of several of the agency's models,[8] and later enlisted a

---

error save for the admission of certain coconspirator statements which we conclude was harmless beyond a reasonable doubt, *see* section VIII of the court's opinion, we have no occasion to address Lodge's contention that he was prejudiced by the "totality" of various alleged violations of his constitutional rights. *See Chapman v. California,* 386 U.S. 18, 22–23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967).

4. At the time of trial, Woodward was in prison in California, serving sentences for two related sex offenses.

5. Cross and Lodge also hoped that this deception might ultimately provide them with an opportunity to molest some of the children.

6. Cross, Diwan, and Lodge were officers or directors of this corporation, which Cross named "Viewfinder, Inc."

7. Cross explained that the documentary, to be entitled, "Susan's Magic Carpet," would be about a girl who travels around the world, and that, in order for the film to be realistic, the principal character would briefly have to appear nude in certain scenes such as, for example, an aboriginal dance sequence in New Guinea.

8. Cross exchanged extensive correspondence with the parents of those girls in whom he was interested and in some cases with the girls

professional photographer in Tampa to take "casting" pictures of these young girls.[9] Cross instructed the photographer to shoot several nude photos of the girls, allegedly in order to gauge their reactions to being filmed in the nude, and to determine whether the models were too physically developed to play the role of a young child. Cross further directed the photographer to provide him with full frontal nude pictures in the form of color transparencies three times the size of normal slides.[10] Like the talent agency, both the photographer and the girls' parents were told by Cross that the photo sessions were necessary because the film would include scenes in certain locations where native people routinely wore little or no clothing. Cross also assured them that these photos would not be reproduced and would be returned to the parents.

However, soon after receiving the transparencies, Cross mailed them to Lodge to be processed and enlarged so they would be suitable for sale. Lodge developed and sent to Cross slides from some of these transparencies, but indicated that several of the other pictures would need to be retaken because of their inferior quality.[11] When Lodge's house was searched in May 1983, police discovered a negative strip containing a sequence of nude, black and white photos of one of the Tampa girls.[12] In addition, the strip contained versions of these photos that Lodge had cropped to highlight the girl's nude torso, followed by closeup photographs of adult female genitalia which he had added.

Neither Cross nor Lodge testified at trial. Cross, who represented himself, called several law enforcement officers and fellow prisoners to testify, in an attempt to show that he had planned and engaged in these various child pornography schemes in the course of acting as a police informant. Two character witnesses testified on Lodge's behalf.

## DISCUSSION

### I. SEVERANCE

Lodge contends that he was deprived of his right to a fair trial as a result of being tried jointly with his co-defendant Cross. Lodge argues that the district court erred in summarily denying his pre-trial motions for severance, and that he was unfairly prejudiced by a joint trial.[13] He advances three grounds in support of this claim of error: (1) that Cross would have provided exculpatory testimony on Lodge's behalf had their cases been severed, (2) that Lodge's and Cross's defenses at trial were antagonistic, and (3) that Cross's behavior during the trial and evidence introduced solely against him had a prejudicial spill-

---

themselves, providing them with widely varying information concerning the storyline and venues for the film, production and travel arrangements, their chances of selection, and the salary each actress would be paid if chosen for the project.

9. Because Cross was a prison inmate in Florida during this time, in all his communications with the talent agency, models' parents, the Tampa photographer, and Lodge, he used Diwan to set up "conference calls" and relay his mail, so as to conceal the fact that he was incarcerated.

10. Cross carefully specified the poses in which the children were to be photographed. However, because they were uncomfortable with some of these poses, including one which called for the children to squat on their knees, the photographer and several of the parents did not agree to the shooting of certain nude photos, and the photographer deliberately did a poor job of developing the film so that the pictures he did take could not be copied.

11. Around this time, Cross suggested in a letter that Lodge return the original, poor-quality transparencies to him, explaining that he had been able to persuade the girls' parents to allow another nude photo session, but only on the condition that the first set of pictures be destroyed.

12. Also found in Lodge's home were a number of reproductions of the Tampa pictures that Lodge had arranged to have developed by a commercial photo lab.

13. Lodge moved for severance under Federal Rule of Criminal Procedure 14, which provides, in relevant part:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

over effect on the jury's determination of Lodge's guilt.

As a general rule, defendants who have been jointly indicted should be tried together, particularly in conspiracy cases. *United States v. Castillo–Valencia,* 917 F.2d 494, 498 (11th Cir.1990). The decision whether to grant a severance is committed to the sound discretion of the trial court and can only be overturned for an abuse of such discretion. *United States v. Rucker,* 915 F.2d 1511, 1512 (11th Cir. 1990) (per curiam). In considering a motion for severance under Federal Rule of Criminal Procedure 14, a district judge is required to balance the prejudice that a defendant may suffer from a joint trial, against the public's interest in judicial economy and efficiency. In order to establish that a refusal to sever constituted an abuse of discretion, an appellant must demonstrate that he "suffered compelling prejudice against which the trial court was unable to afford protection." *United States v. Riola,* 694 F.2d 670, 672 (11th Cir.), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1532, 75 L.Ed.2d 953 (1983). Guided by these principles, the court considers each of Lodge's separate theories.

### A. Exculpatory Evidence

Lodge argued to the district court in his motions for severance that if he and Cross were tried separately, Cross would provide exculpatory testimony on Lodge's behalf. In support of this contention, Lodge submitted an affidavit from Cross, in which Cross promised to testify "if I can do so without exposing myself to criminal jeopardy in [this] case," and described his proposed testimony. In his affidavit, Cross stated that Lodge had neither known of nor participated in the Tampa photo arrangements, but had "inadvertently" been mailed these photographs; that he and Lodge had otherwise never exchanged child pornography but only "naturist photographs" of the kind found in "nudist magazines;" and that he had communicated with Lodge as a police informant surreptitiously seeking information about illegal activities. Lodge now contends that Cross's testimony could have refuted the government's conspiracy charge against him.[14]

In order to warrant severance based on a co-defendant's potential testimony, an accused must first show: "(1) a bona fide need for the testimony; (2) the substance of the desired testimony; (3) the exculpatory nature and effect of the desired testimony; and (4) that the codefendant would indeed ... testif[y] at a separate trial." *United States v. Funt,* 896 F.2d 1288, 1297 (11th Cir.1990). If the defendant satisfies these threshold requirements, the trial judge then must "(1) examine the significance of the testimony in relation to the defendant's theory of the case; (2) assess the extent of prejudice caused by the absence of the testimony; (3) consider judicial administration and economy; and (4) give weight to the timeliness of the motion." *Id.*

We are not persuaded as to the exculpatory nature or effect of Cross's proposed testimony. The affidavit consisted of little more than bare conclusory assertions of Lodge's lack of involvement, and contained no clear indication of any "specific and exonerative facts" to which Cross would have testified. *United States v. Pepe,* 747 F.2d 632, 651 (11th Cir.1984). *See also United States v. Johnson,* 713 F.2d 633, 641 (11th Cir.1983), *cert. denied,* 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984). Furthermore, Cross's proffered testimony was entirely self-serving in light of its emphasis on his own defense theory that he was acting as a police informant, and was contradicted by the extensive evidence of Lodge's considerable involvement in the Tampa photo scheme which was introduced at trial. For these reasons, Cross's affidavit lacked any substantial credibility. Therefore, the exculpatory value of his proposed testimony would have been trivial, and Lodge's defense did not suffer harm, let alone compelling prejudice, as a result of Cross's unavailability. *See Pepe,* 747 F.2d at 651; *Johnson,* 713 F.2d at 641;

---

**14.** Lodge's defense at trial can be characterized as an attempt to show that he was, at most, a passive recipient of child pornography from Cross.

*United States v. Metz,* 608 F.2d 147, 156 (5th Cir.1979), *cert. denied,* 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980).[15] However, even if the court were persuaded that Cross's testimony would have benefitted Lodge, we would still conclude that Lodge was not entitled to a severance on this basis. The trial in this case lasted approximately two months, and involved dozens of witnesses and hundreds of exhibits. As in *Pepe,* "the savings in time and resources produced by holding a joint trial in such a complex conspiracy case outweighed the possible benefit" Lodge might have "derived" from Cross's testimony. *Id.,* 747 F.2d at 651.[16] *See also Metz,* 608 F.2d at 156. We conclude that the district court did not abuse its discretion in refusing to try Lodge and Cross separately on the basis of Cross's alleged exculpatory testimony.[17]

### B. *Antagonistic Defenses*

 A defendant is not entitled to a trial separate from that of his co-defendant simply because their defenses are prejudicial to one another. Rather, a trial court abuses its discretion in denying a severance only when the defenses advanced are "so antagonistic as to be irreconcilable or mutually exclusive." *United States v. Castillo–Valencia,* 917 F.2d 494, 498 (11th Cir. 1990). Severance is compelled only "if the jury, in order to believe the core of testimony offered on behalf of one defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant."

*United States v. Rucker,* 915 F.2d 1511, 1513 (11th Cir.1990) (per curiam), *quoting United States v. Berkowitz,* 662 F.2d 1127, 1134 (5th Cir. Unit B 1981).[18] *See also United States v. Caporale,* 806 F.2d 1487, 1510 (11th Cir.1986) (severance mandated only when "the jury will infer that both defendants are guilty solely because of the conflict" between their defenses), *cert. denied,* 482 U.S. 917, 107 S.Ct. 3191, 96 L.Ed.2d 679 (1987). Lodge's and Cross's defenses at trial, however, were not so incompatible that the jury could not reasonably have decided on a version of events that accommodated both of their theories. *See Castillo–Valencia,* 917 F.2d at 498; *United States v. Sawyer,* 799 F.2d 1494, 1504 (11th Cir.1986) (per curiam), *cert. denied,* 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987). At trial, Lodge sought to undercut the government's charge that he joined and participated in the Tampa photo conspiracy. In cross-examination and argument, Lodge's counsel suggested to the jury that Lodge had not solicited these nude pictures from Cross, and never intended to prepare them for commercial distribution as child pornography. Cross's defense, on the other hand, was that he communicated with Lodge as a police informer acting under a grant of immunity. The jury could have believed both stories—that Cross was secretly working for law enforcement, and that Lodge received the photos but never agreed to become a part of Cross's scheme.[19] This is

---

**15.** In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the court adopted as binding precedent all of the decisions of the Former Fifth Circuit handed down prior to the close of business on September 30, 1981.

**16.** "Although considerations of judicial economy cannot be elevated to the point where they impair a defendant's rights under the Constitution or Fed.R.Crim.P. 14, they are relevant." *Pepe,* 747 F.2d at 651 n. 21. In this case, as in *Pepe,* judicial economy is not "an overriding reason" for our decision that the trial court's denial of Lodge's severance motions was not an abuse of discretion. *See id.*

**17.** Because the court finds that Cross's proffered testimony would have been of insignificant or no benefit to Lodge, we need not reach the issue of whether the affidavit sufficiently demonstrat-

ed that Cross would in fact have testified on Lodge's behalf had their trials been severed. However, we note the Cross's promise to testify only if he could do so "without exposing [him]self to criminal jeopardy" probably fails to satisfy this requirement. *See Funt,* 896 F.2d at 1298.

**18.** In *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33, 34 (11th Cir.1982) (en banc), the Eleventh Circuit adopted as binding precedent all of the post-September 30, 1981 decisions of Unit B of the former Fifth Circuit.

**19.** Cross himself never testified and none of his evidence implicated Lodge. *See United States v. Pirolli,* 742 F.2d 1382, 1386 (11th Cir.1984), *cert. denied,* 471 U.S. 1067, 105 S.Ct. 2143, 85 L.Ed.2d 500 (1985); *United States v. Berkowitz,* 662 F.2d

not a case in which Cross's defense was Lodge's guilt. *See Rucker,* 915 F.2d at 1513; *United States v. Magdaniel–Mora,* 746 F.2d 715, 720 (11th Cir.1984). Therefore, we also conclude that the trial court's refusal to grant a severance on the basis of an antagonism between Cross's and Lodge's defenses was not an abuse of discretion.

### C. *Prejudicial Spillover*

Finally, Lodge claims that his conviction should be reversed because his joint trial with Cross created a prejudicial spillover effect on the jury's determination of Lodge's guilt. Lodge contends that Cross's misbehavior as a pro se litigant and the government's introduction of inflammatory evidence against Cross deprived Lodge of his right to a fair trial.[20] We find that this theory, like Lodge's other grounds for challenging the denial of severance, is without merit.

 As the court has noted, denial of severance will be considered error where the defendant can demonstrate that he suffered "compelling prejudice" as a result of the spillover effects of being tried jointly with a co-defendant. The applicable test is whether it was "within the capacity of [the] jurors to follow [the] court's limiting in-

structions and appraise the independent evidence against each defendant solely upon that defendant's own acts, statements, and conduct." [21] *United States v. Silien,* 825 F.2d 320, 232 (11th Cir.1987) (per curiam). In this case, the trial court specifically charged the jury that, "each offense and the evidence pertaining to it should be considered separately," and that "the case of each defendant should be considered separately and individually." [22] *See United States v. Pritchett,* 908 F.2d 816, 822 (11th Cir.1990); *United States v. Garrett,* 727 F.2d 1003, 1015 (11th Cir.1984), *aff'd,* 471 U.S. 773, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985). Indeed, the fact that the jury acquitted Lodge on a number of counts on which it convicted Cross confirms that the jurors "sifted the evidence and made individual determinations of guilt and innocence." *United States v. Khoury,* 901 F.2d 948, 966 (11th Cir.1990). *See also United States v. Berkowitz,* 662 F.2d 1127, 1135 (5th Cir. Unit B 1981). Moreover, Lodge fails to explain how any particular comment by, or testimony against, Cross was either adverse to Lodge or created a risk of conflating the jury's determination of each defendant's guilt.[23] *See United States v. LaChance,* 817 F.2d 1491, 1497 (11th Cir.), *cert. denied,* 484 U.S. 928, 108

---

1127, 1134 (5th Cir. Unit B 1981) (test for antagonistic defenses considers whether each defendant had to confront hostile witnesses presented by co-defendant). *Compare Rucker,* 915 F.2d at 1513 ("each defendant [was] the government's best witness against the other") (internal quotation omitted). It is true that in argument and cross-examination, Cross suggested to the jury that he had in fact mailed to Lodge certain letters and photographs at issue in the case. However, although such information was consistent with the government's case against Lodge, there was overwhelming independent evidence presented at trial that Lodge had received these letters and photos, and Lodge's own defense implicitly acknowledged that he had seen and possessed these items. *See United States v. Riola,* 694 F.2d 670 (11th Cir.), *cert. denied,* 460 U.S. 1073, 103 S.Ct. 1532, 75 L.Ed.2d 953 (1983).

**20.** During the trial, the district judge frequently admonished Cross, in the presence of the jury, for improper remarks made by him during his cross-examination of government witnesses. In addition, the government presented testimony against Cross describing various pornographic

photographs of children, other than those involved in the Tampa photo scheme, which were found in his possession.

**21.** A defendant does not suffer compelling prejudice simply because most of the evidence presented at trial is applicable only to his co-defendant, or because such evidence pertains to the co-defendant's reputation or criminal record. *United States v. Pritchett,* 908 F.2d 816, 822 (11th Cir.1990). Similarly, it is not enough for the defendant to show that he would more likely have been acquitted had he been tried separately, or that the evidence against his co-defendant was stronger than that against himself. *United States v. Meester,* 762 F.2d 867, 883–84 (11th Cir.), *cert. denied,* 474 U.S. 1024, 106 S.Ct. 579, 88 L.Ed.2d 562 (1985).

**22.** Lodge does not allege that the trial court improperly denied any requests for instructions.

**23.** Indeed, much of the cross-examination conducted by Lodge's counsel focused on carefully distinguishing the evidence against Cross from that against Lodge.

S.Ct. 295, 98 L.Ed.2d 255 (1987). We are not persuaded that Lodge suffered contaminating prejudice as a result of his joint trial with Cross. The trial court's refusal to sever was not an abuse of discretion on this or any of the other rationales advanced by Lodge.

## II. SEARCH WARRANT

■ Lodge also contends that the district court erred in failing to conduct a pretrial evidentiary hearing on his motion to suppress evidence seized during a search of his Seattle home in May 1983. At trial, Lodge argued that Detective Thomas Dittmar of the Seattle Police Department intentionally or recklessly included false information and misleadingly omitted material facts from his search warrant affidavit. The district court, however, found that even if the allegedly false or misleading statements were deleted or corrected, the affidavit was still sufficient to establish probable cause for the search of Lodge's house. Relying on our independent weighing of the allegations in such a redacted affidavit, we too conclude that the Seattle judge who issued the search warrant had a "substantial basis" for finding that probable cause existed. *See United States v. Sims*, 845 F.2d 1564, 1571 (11th Cir.), *cert. denied*, 488 U.S. 957, 109 S.Ct. 395, 102 L.Ed.2d 384 (1988); *United States v. Kirk*, 781 F.2d 1498, 1505 (11th Cir.1986). We therefore find no error.

In *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the United States Supreme Court recognized the limited constitutional right of a criminal defendant to attack the veracity of a warrant affidavit.[24] In order to merit an evidentiary hearing on such a claim, however, an accused must make a concrete, preliminary showing that: (1) the affiant deliberately or recklessly included false statements, or failed to include material information, in the affidavit; and (2) the misrepresentation was essential to the finding of

probable cause. *Id.* at 171–72, 98 S.Ct. at 2684–85. *Accord United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 259, 112 L.Ed.2d 216 (1990).

In this case, Dittmar's affidavit contained information that he received from William Dworin, a Los Angeles police detective who had corresponded with Lodge in the course of an undercover investigation of child pornography.[25] In a then-recent letter to Dworin, Lodge had stated that he was "fairly active in photography," had a collection of "15,000 to 20,000 negatives," and had "contacts that may eventually lead to some good models." Lodge had also indicated that he had "a fair amount of European material, but as you know acquisition has been difficult lately." Lodge assured Dworin that it would be "safe" to send him "any mail of any type." In addition to providing the Seattle detective with a copy of Lodge's letter, Dworin also informed Dittmar that Lodge's name had appeared on Cross's mailing lists for child pornography when he arrested Cross several years earlier. Finally, Dittmar's affidavit also contained certain information about Lodge's involvement in the Tampa photo hoax. According to the affidavit, the source of this last material was a government official who, in turn, had learned of the conspiracy from Cross.

Lodge argues that the following "facts," which he presented to the district court, constituted a "substantial preliminary showing," mandating a pretrial hearing on his suppression motion: (1) Dittmar failed to contact Cross to verify Lodge's involvement in the Tampa scheme; (2) Cross denied making the statements attributed to him in the affidavit; (3) Dittmar failed to disclose that such information actually came from several prisoners incarcerated with Cross, whose reliability was unproven; and (4) the affidavit did not describe or

**24.** In *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), the Court reaffirmed *Franks* even while at the same time carving out a "good faith" exception to the exclusionary rule for warrants unsupported by

probable cause. *See id.* at 923, 104 S.Ct. at 3421.

**25.** Dworin wrote to Lodge under the fictitious name, "Pete Davis."

attach the letter from Dworin which elicited Lodge's return correspondence.

We assume, as did the district court, that Cross has satisfied the first prong of *Franks* by alleging, in more than conclusory fashion, a deliberately or recklessly false statement or material omission from the affidavit. However, even if all the information attributed to Cross were removed and the letter from Dworin to Lodge were added, the redacted affidavit would still contain allegations sufficient to support a finding of probable cause. *See Jenkins,* 901 F.2d at 1080; *Sims,* 845 F.2d at 1571; *United States v. Ofshe,* 817 F.2d 1508, 1513 (11th Cir.), *cert. denied,* 484 U.S. 963, 108 S.Ct. 451, 98 L.Ed.2d 391 (1987). Lodge's letter, with its cryptic references to "European material," "good models," his huge collection of photographs, and the need for secrecy, could reasonably be read as a veiled discussion of child pornography.[26] Such an interpretation is only supported by Dworin's antecedent letter to Lodge,[27] and by the fact that Lodge's name had earlier appeared on Cross's child pornography mailing list. In short, even if restricted to such information, the affidavit demonstrated "a fair probability that contraband or evidence of a crime [would] be found in" Lodge's home. *Illinois v. Gates,* 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). *See also Jenkins,* 901 F.2d at 1080; *United States v. Strauss,* 678 F.2d 886, 892 (11th Cir.), *cert. denied,* 459 U.S. 911, 103 S.Ct. 218, 74 L.Ed.2d 173 (1982). For this reason, we hold that Lodge was not entitled to an evidentiary hearing on his *Franks* motion.[28]

## III. SUFFICIENCY OF THE EVIDENCE

### A. *Lodge*

In his third and final claim of error, Lodge challenges his conviction of conspiracy to exploit a minor sexually, on the ground that the evidence introduced against him at trial was insufficient as a matter of law to sustain a guilty verdict on this charge. In evaluating the sufficiency of evidence, we must view the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the government.[29] *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Diaz,* 916 F.2d 655, 656 (11th Cir.1990). The jury's verdict must be upheld "if any reasonable construction of the evidence allowed the jury to find the appellants guilty beyond a reasonable doubt." *United States v. Obregon,* 893 F.2d 1307, 1311 (11th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990). *See also United States v. Vera,* 701 F.2d 1349, 1357 (11th Cir.1983) ("It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt").

Lodge was convicted, under the federal conspiracy statute, 18 U.S.C.A.

---

**26.** This is how the letter was understood by Dittmar, an experienced expert, according to the affidavit, in the investigation of offenses involving child pornography.

**27.** In his unsolicited letter to Lodge, Dworin wrote that a mutual friend had suggested that the two men shared "a common interest," and went on to note that he was "a firm believer in the liberal upbringing of young girls and have raised my 10–year old girl this way. She has been photographed extensively in her training. I hope to hear from you and exchange experiences. I also have a small collection of European material that you may enjoy."

**28.** Lodge also argues that "chain of custody problems" aggravated the prejudice he suffered at trial from the introduction of evidence dis-

covered pursuant to the allegedly illegal search of his house. Although items seized from Lodge's Seattle home were at one time commingled with evidence obtained in Florida, the trial record indicates that law enforcement officials later re-separated the evidence. Moreover, the items of evidence found in Lodge's house were adequately identified by witnesses at trial who testified to their sources and original conditions. The district court did not abuse its discretion in admitting these materials into evidence over Lodge's chain of custody objections. *See United States v. Burchfield,* 719 F.2d 356, 357 (11th Cir.1983) (per curiam).

**29.** *See also United States v. Morales,* 868 F.2d 1562, 1572 (11th Cir.1989) ("we will assume that the jury credited the testimony of the government's witnesses").

§ 371 (1966), of conspiring with Cross and Diwan to sexually exploit children in violation of 18 U.S.C.A. § 2251(a) (1982).[30] This latter section, as it existed at the time of Lodge's offense, applied to "any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in any sexually explicit conduct for the purpose of producing any visual or print medium depicting such conduct ... if such person knows or has reason to know that such visual or print medium will be ... mailed, or if such visual or print medium has actually been ... mailed." 18 U.S.C.A. § 2251(a) (1982).[31] Lodge now contends that the evidence at trial failed to prove the elements of a conspiracy under § 371. To support a conviction for conspiracy, the prosecution must prove that two or more persons agreed to commit a crime, that the defendant knew of the conspiracy, and that he voluntarily participated in helping to achieve its objective. *United States v. Roper*, 874 F.2d 782, 787 (11th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 189, 107 L.Ed.2d 144 (1989). An additional element, under § 371, is an overt act committed by one of the co-conspirators in furtherance of the conspiracy. 18 U.S.C.A. § 371 (1966); *United States v. Hollifield*, 870 F.2d 574, 577 (11th Cir.1989) (per curiam). The existence of a conspiracy may be demonstrated by direct or circumstantial proof, including inferences from statements or conduct of the participants. *United States v. Lignarolo*, 770 F.2d 971, 978 n. 9 (11th Cir.1985), *cert. denied*, 476 U.S. 1105, 106 S.Ct. 1948, 90 L.Ed.2d 358 (1986). Similarly, the defendant's knowledge of and membership in the conspiracy may be proven by acts on his part which furthered the goal of the conspiracy.[32] *United States v. Morales*, 868 F.2d 1562, 1572 (11th Cir.1989).

■ The evidence presented by the government amply demonstrated both the existence of, and Lodge's knowing involvement in, a conspiracy with Cross and Diwan to produce and market child pornography. The correspondence between Cross, Lodge, and third parties, as well as altered versions of the Tampa photos found in Lodge's home, make clear that Lodge knew of Cross's and Diwan's plan to deceive the models and their parents into providing nude pictures, and that Lodge actively participated in the scheme by processing and modifying these photos in order to render them suitable for commercial distribution. The proof at trial was more than adequate to support Lodge's conviction.[33]

### B. *Cross*

■ Cross also argues that the evidence at trial was legally insufficient as to the conspiracy charge of which he too was found guilty. Cross alleges not that the government failed to prove all the elements of a conspiracy; rather, he contends that his conviction should be reversed because the evidence did not demonstrate that the Tampa photos were obscene, or that he endeavored to produce them for pecuniary gain. However, the antecedent version of 18 U.S.C.A. § 2251, which Cross was convicted of violating, did not require that either the "sexually explicit conduct" engaged in by the minor or the "visual or print medium" created from that conduct be obscene.[34] *See* 18 U.S.C.A. §§ 2251(a), 2253(2) (1982); *New York v. Ferber*, 458

---

**30.** 18 U.S.C.A. § 371 (1966) forbids any conspiracy to commit an offense against the United States.

**31.** Section 2251, originally enacted in 1978, was amended in 1984 and again in 1986 and 1988. Cross and Lodge, whose crimes occurred between 1981 and 1983, were prosecuted under the original, 1978 version of the statute.

**32.** The government need only show that the defendant was aware of the "essential purpose" of the conspiracy, rather than that he "knew all the details." *Obregon*, 893 F.2d at 1311.

**33.** Lodge also argues that he cannot legally be held to have conspired with Cross because Cross was acting as a police informant. Because we find that Cross's conduct was not undertaken on behalf of law enforcement officials, *see* section V(A) of the court's opinion, we also find that Lodge's derivative claim lacks merit.

**34.** Sexually explicit conduct was defined to include "actual or simulated ... lewd exhibition of the genitals or pubic area of any person." 18 U.S.C.A. § 2253 (1982). Neither Lodge nor Cross claim on appeal that the Tampa pictures or the scenes they depicted were not "lewd" within the meaning of the statute; therefore, we do not reach this issue. However, even if they had raised such an argument, we would still affirm their convictions on this count. The

U.S. 747, 762 n. 15, 102 S.Ct. 3348, 3357 n. 15, 73 L.Ed.2d 1113 (1982); S.Rep. No. 438, 95th Cong., 2d Sess. 12–14, *reprinted in* 1978 U.S.Code Cong. & Ad.News 40, 49–52.[35] Furthermore, while Cross is correct in pointing out that, prior to the 1984 amendments, an accused could not be convicted of violating § 2251 absent proof that he produced the material in question for financial gain,[36] nevertheless, the government's evidence, including Cross's writings and testimony by his then-fellow prison inmates, clearly showed that one of his ultimate purposes in hatching the Tampa photo scheme was to profit from sales of the nude pictures.[37] This claim of error is therefore without merit.

## IV. JURY INSTRUCTIONS ON MAIL FRAUD

Relying on the Supreme Court's decision in *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987),[38] Cross asks us to reverse his mail fraud convictions on the ground that the jury could have concluded that he perpetrated the Tampa photo hoax simply to indulge his own personal, sexual gratification, and therefore could have found him guilty of engaging in a scheme to deprive his victims of intangible, non-property rights, outside the scope of the mail fraud statute, 18 U.S.C.A. § 1341 (1984).[39] However, after reviewing the indictment, the evidence offered at trial, and the jury instructions, we conclude that the jury in this case necessarily determined that Cross schemed to defraud the Tampa models, along with their families, the photographer, and the modeling agency, of various servic-

---

Tampa photographs displayed pre-adolescent girls fully nude from a frontal view, and were arranged by Cross in order to be used to satisfy the sexual interests of himself and other pedophiles. Moreover, Cross had also ordered that the children be photographed in the nude, squatting on their knees, but the Tampa photographer felt uncomfortable with and ultimately refused to shoot such pictures. Based on these factors, we are of the opinion that the photographs taken or planned involved "lewd exhibition of the genitals or pubic area." We reach this conclusion despite the obvious fact that the photographs did not portray the models as sexually coy or inviting, and the Tampa photographer who had been duped by Cross did not knowingly or intentionally exhibit the girls in lewd poses. *See United States v. Wolf*, 890 F.2d 241, 245–47 (10th Cir.1989); *United States v. Villard*, 885 F.2d 117, 122–25 (3rd Cir.1989); *United States v. Wiegand*, 812 F.2d 1239, 1243–44 (9th Cir.), *cert. denied*, 484 U.S. 856, 108 S.Ct. 164, 98 L.Ed.2d 118 (1987). *See also Osborne v. Ohio*, —— U.S. ——, 110 S.Ct. 1691, 1698, 109 L.Ed.2d 98 (1990).

35. The Child Protection Act of 1984, which amended § 2251, also removed the obscenity requirement that had previously applied to § 2252, a provision under which Cross was not prosecuted. *See* 18 U.S.C.A. § 2252 (1989); H.R.Rep. 536, 98th Cong., 1st Sess. at 10–11, *reprinted in* 1984 U.S.Code Cong. & Ad.News 492, 501–02.

36. *See* 18 U.S.C.A. § 2253 (1982) (defining "producing" to mean "producing, directing, manu-

facturing, issuing, publishing, or advertising, for pecuniary profit").

37. The district court instructed the jury, pursuant to the statutory definition contained in § 2253, that Cross could only be convicted under § 2251, if he had produced the material in question for "pecuniary profit."

38. *McNally* was decided after Cross's trial but before he filed his opening brief on appeal. This court permitted Cross to file a motion in the district court to set aside his mail fraud convictions as invalid under *McNally*. The district court denied the motion.

39. The statute provides criminal punishment for,

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purposes of executing such scheme or artifice or attempting to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service....

18 U.S.C.A. § 1341 (1984).

The ruling in *McNally* was overridden by the recent enactment of 18 U.S.C.A. § 1346 (1989), which provides that "[f]or the purposes of this chapter [which includes § 1341], the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right to honest services." This later amendment has no application to Cross's case.

es and property of some value.[39] *See United States v. Lang*, 904 F.2d 618, 627 (11th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 305, 112 L.Ed.2d 258 (1990); *United States v. Dynalectric Co.*, 859 F.2d 1559, 1570 (11th Cir.1988), *cert. denied*, 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989). Therefore, we reject this claim of error.

In disposing of an appeal by Cross's codefendant, Diwan, this court has already determined that the indictment in this case sufficiently alleged a plot to deprive the victims of property or money.[41] *See United States v. Diwan*, 864 F.2d 715 (11th Cir.) (per curiam), *cert. denied*, 492 U.S. 921, 109 S.Ct. 3249, 106 L.Ed.2d 595 (1989). The court explained:

> One objective of this conspiracy ... was that the girls forfeit modelling services, photographs, and the likenesses that emanate therefrom. The photographer would lose the value of his services, as would the ... [t]alent [a]gency ... the photographer would necessarily have to use film and other materials in producing the photographs, and [the talent agency] would forfeit proprietary business information—the identities and the addresses of aspiring actresses. All of these items have value to the owner.

*Id.* at 719. Nevertheless, Cross now argues that the evidence presented at trial and the jury charge on the elements of mail fraud allowed the jury to convict him of engaging in a deception involving intangible, *McNally*-type rights. In attempting to identify such rights in this case, which were unprotected by the mail fraud statute, Cross contends that his guilty verdict may have improperly rested on proof show-

ing only that he sought to obtain the Tampa photographs to satisfy his own sexual appetites.

Cross is wrong on all accounts. The evidence at trial proved the indictment's allegations of losses suffered by the victims, as described in *Diwan*. More importantly, the district court's instructions specifically directed the jury that it could return a guilty verdict on the mail fraud counts only if it found that Cross had devised "a scheme to defraud or for obtaining money or property," and defined scheme to include any plan to obtain "money or property." *See Dynalectric*, 859 F.2d at 1573 (concluding that identical instruction comported with *McNally*). The court also charged that to act with "intent to defraud" meant acting "ordinarily for the purpose of causing some financial loss to another or bringing about some financial gain to oneself."[42] As for Cross's claim that his convictions should be reversed because the ultimate goal of the plot was to indulge his pedophilia and not turn a profit, Cross incorrectly focuses on his own ultimate purposes, rather than on the harms suffered by his victims.[43] In rejecting the same contention in Diwan's case, this court stated:

> Diwan misses the point when she argues that the primary objective of the scheme was merely personal sexual indulgence, and not the deprivation of property through fraud. The entire array of deprivations announced in the indictment would be a necessary result of the overt acts planned to further the scheme. If the defendants were to achieve success in their endeavor in the chosen manner,

See Corcoran v. American Plan Corp., 886 F.2d 16, 19 n. 4 (2nd Cir.1989).

**40.** In *McNally*, the Court held that the mail fraud statute did not apply to schemes to defraud citizens of their rights to honest government. *Id.* at 359, 107 S.Ct. at 2881. Subsequent decisions which clarified *McNally* clearly signalled that a fraudulent scheme was not exempt from the mail fraud statute, even if there were no tangible loss of property or monetary harm, as long as the victim was deprived of "something of value." *See Carpenter v. United States*, 484 U.S. 19, 27, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987); *Dynalectric*, 859 F.2d at 1570.

**41.** Diwan had entered a conditional guilty plea, reserving the right to appeal the district court's denial of her motion to dismiss the indictment.

**42.** The court also instructed that the government had to prove beyond a reasonable doubt that Cross devised a scheme to defraud "substantially the same as the one alleged in the indictment."

**43.** Furthermore, as the court has already discussed, the evidence at trial amply demonstrated that Cross sought the nude photos, at least in part, in hopes of employing them for financial gain. *See* section III of the court's opinion.

the girls, the photographer, and the talent agency would have to lo: :, and what they would lose is property. *Diwan*, 864 F.2d at 719–20. Cross's mail fraud convictions were not invalid under *McNally* and its progeny.

## V. ADMISSION OF CROSS'S LETTERS TO LODGE

### A. *Immunity*

 As the centerpiece of his defense at trial, Cross sought to prove that, in corresponding with Lodge, he was acting as an informant for the Florida Department of Law Enforcement under an official grant of immunity. Cross claims that his convictions should be overturned because the trial court improperly admitted as evidence letters that he wrote to Lodge as part of his work on behalf of a government investigation of child pornographers.[44] For the purposes of resolving this issue, we accept, as did the district court, Cross's contention that such evidence would be subject to exclusion if it were indeed a product of either an actual immunity agreement or Cross's good faith belief that he had been granted immunity from prosecution. *See United States v. Harvey*, 869 F.2d 1439, 1444 (11th Cir.1989); *Rowe v. Griffin*, 676 F.2d 524, 527–28 (11th Cir. 1982); *United States v. Weiss*, 599 F.2d 730, 735–36, 738 n. 17 (5th Cir.1979). The district court overruled Cross's objection to admission of the correspondence, in light of the government's contrary evidence that Cross was not working as a law enforcement informant.[45] Because Cross's immunity contentions raised an issue relevant to his guilt or innocence, the jury was allowed to hear the evidence and received instructions on this defense.[46] In convicting Cross on the conspiracy count, the jury necessarily found that Cross had possessed the requisite criminal intent when he conspired with Lodge. We find no reason to disturb the jury's resolution of this factual issue against Cross.[47]

In 1979, Cross, through his attorney, Raymond Cramer, contacted the Florida Department of Law Enforcement to ex-

---

**44.** Cross also contends that the district court erred in failing to dismiss the indictment's conspiracy count because it was based on his immunized conduct. Because, as discussed below, we concur with the jury's determination that Cross did not in good faith believe he was acting on behalf of law enforcement when he wrote to Lodge or undertook other actions in furtherance of his pornographic ventures, we conclude that this claim of error, like Cross's related contention that his correspondence with Lodge was improperly admitted at trial, is without merit.

**45.** Cross complains that the district court should have ruled on his motion to exclude the letters *in limine*, as he had requested, rather than during the trial at the point when the government sought to introduce such correspondence. However, we find that it was proper for the court to reserve decision on Cross's request. The motion was filed on the eve of an already twice-delayed trial, and resolution of the immunity issue at that juncture would have required a trial-in-miniature of the government's and Cross's evidence. Moreover, the district court's deferral of its ruling did not adversely affect Cross's ability to raise this issue on appeal. *See* Fed.R.Crim.P. 12(e) (determination of pre-trial motions may be postponed until trial "for good cause"); *United States v. Beard*, 761 F.2d 1477, 1479 (11th Cir.), *cert. denied*, 474 U.S. 907, 106 S.Ct. 239, 88 L.Ed.2d 240 (1985).

**46.** Because it challenged the truth of the indictment's allegations, the district judge properly determined that the immunity issue presented a factual question for the jury, and that it was therefore not within the province of the court ultimately to weigh the government's and Cross's evidence on this matter. *See United States v. Ayarza–Garcia*, 819 F.2d 1043, 1048 (11th Cir.), *cert. denied*, 484 U.S. 969, 108 S.Ct. 465 (1987); *United States v. Clark*, 546 F.2d 1130, 1135 (5th Cir.1977). This is in contrast to the ordinary, non-guilt-related immunity claim, in which the government seeks to use against a defendant evidence that he contends derives from his previous immunized testimony. *See, e.g., Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972).

**47.** We find Cross's generalized claim of error based on the purported immunity agreement to be without merit regardless of whether we examine the trial court's evidentiary ruling under a clearly erroneous standard of review, *see United States v. Weiss*, 599 F.2d 730, 735 (5th Cir. 1979); *United States v. Calimano*, 576 F.2d 637, 640 (5th Cir.1978), or instead review the sufficiency of the evidence on the element of Cross's criminal intent under a "reasonable construction of the evidence" standard. *See United States v. Obregon*, 893 F.2d 1307, 1311 (11th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 1833, 108 L.Ed.2d 961 (1990). *See also* section III(A) of the court's opinion.

plore the possibility of assisting the Department in an investigatioʌ of child pornography distribution. In 1980, Cross, Cramer, and Department agent Michael Brick met on several occasions to discuss ways in which Cross could aid in the investigation, but no agreement was reached. Brick suggested that Cross maintain his contacts with pornography distributors, but not with individual pedophiles. Brick also instructed Cross to mail only written materials, and specifically rejected a proposal by Cross that he send out a fake brochure containing pictures of nude children.[48] Later that year, Department agent George Syring, who had been reassigned in Brick's place, together with United States Postal Inspector Ted Griem also contacted Cross in order to solicit his assistance in gathering information about child pornographers. At a meeting with Cross in 1981, Syring and Griem instructed him to correspond with four magazine advertisers, who they suspected were peddling child pornography, through a post office box rented by Syring under a false name. No letters to or from Cross were ever received at this post office box. Instead, Cross asked the

Department for a grant of immunity before proceeding with any correspondence. Several months later, the Department's legal counsel forwarded a draft immunity agreement to Cross which he signed and returned to the Department through his attorney, Cramer.[49] The agreement was never signed by any law enforcement official and was never returned to Cramer or Cross.[50] Cramer testified that he assumed that the Department's failure to return the immunity agreement meant that they had decided not to go forward with it.[51]

What is most telling is that, contrary to his instructions, Cross never informed any of the government officials with whom he communicated during this period about the Tampa photo scheme or that he was mailing nude pictures, nor did he ever receive permission from any law enforcement officer to engage in such activities.[52] Indeed, Cross's intrigues involving the child models occurred in late 1982 and early 1983, well after he had last had any discussions with or received any news from law enforcement officers concerning his assistance in an investigation or the possibility that he

48. Cross places false weight on a 1981 draft letter sent to Cramer by Brick. The letter, which was originally drafted by Cramer and modified by Brick, was to be sent to Florida parole officials on Cross's behalf. It erroneously stated that an immunity agreement had been "issued" for Cross's "future association with the porno-trade during the course of his assistance" to the Department. Cramer testified that he knew that Brick's failure to change or remove this phrase from the draft letter did not mean the immunity agreement had been signed or approved. The proof at trial clearly showed that Cross had no reason to, and in fact did not, infer from this stray, incorrect comment that he henceforth had license to establish a pornographic enterprise.

49. The "Contract of Immunity" indicated that if he cooperated with law enforcement officials, Cross would not be prosecuted for past pornographic activities or for future attempts to solicit child pornography. As such, it did not cover Cross's mailings of pornographic photos or attempts to have these photos prepared for commercial distribution.

50. The agreement contained labeled blank spaces for the signatures of the state attorney and an assistant state attorney, but was never signed by either of these officials. Although prison investigators discovered in Cross's cell a

copy of the immunity agreement which purportedly was signed by an assistant state attorney named "Richards," the government presented evidence that no lawyer by this name worked in the office of the state attorney. There was also testimony from one of Cross's then-fellow prison inmates that Cross had tampered with the document, as well as testimony from a handwriting expert that the "Richards" signature was similar to Cross's and that Cross had disguised his handwriting exemplars. Cross's duplicity in this matter clearly indicates he was aware that he had no valid immunity agreement with law enforcement officials.

51. In 1981, Syring informed Cross that he was being transferred to Fort Myers, Florida, and instructed Cross to contact him when he was granted immunity. Syring never again heard from Cross.

52. Although Cramer did provide the Department with copies of several of Woodward's California photographs, these were different photos than the ones sent to Lodge. Moreover, as with the Tampa photos, no government official was informed of or approved Cross's mailing of the California photos to Lodge, although Cross had given Lodge's and Woodward's names to several law enforcement agents.

would be granted immunity. In short, based on these facts, it was not unreasonable for the jury to find that Cross did not engage in these activities under a good faith belief that he was acting on behalf of law enforcement and under a grant of immunity.[53] Clearly rather, Cross was, as the government aptly describes it, "playing both ends against the middle in a cynical effort to create a defense for himself if his efforts to obtain pornographic pictures of little girls were discovered."[54]

### B. *Relevancy and Undue Prejudice*

■ In addition to challenging the admission of his correspondence with Lodge on the basis of his purported immunity agreement, Cross also claims that the letters should have been excluded because they were unduly prejudicial and because those which predated the conspiracy were irrelevant to the charges against him. A district court's admission of "extrinsic act" evidence under Federal Rule of Evidence 404(b) will not be reversed absent an abuse of discretion.[55] *United States v. Jones*, 913 F.2d 1552, 1556 (11th Cir.1990). In order to be admissible under Rule 404(b), extrinsic act proof must simply be relevant.[56] *Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496, 1501, 99

L.Ed.2d 771 (1988). Cross's pre–1980 correspondence to Lodge,[57] in which he discussed at length various plots to produce and distribute child pornography, was properly introduced to demonstrate both appellants' intent to accomplish this same illegal purpose with regards to the Tampa photo hoax.[58] *See* Fed.R.Evid. 404(b); *Jones*, 913 F.2d at 1566; *United States v. Collins*, 779 F.2d 1520, 1533 (11th Cir.1986). Evidence explaining the onset of Cross and Lodge's planning of illegal activities was particularly important because of the unusual circumstances in this case: Cross and Lodge had never met, they lived on opposite coasts, and Lodge was not aware that Cross was incarcerated. *See id.; United States v. Mancari*, 875 F.2d 103, 105 (7th Cir.1989); *United States v. Marks*, 816 F.2d 1207, 1209 (7th Cir.1987). In short, contrary to what Cross suggests, there is no absolute bar on the introduction of evidence which pre-dates an alleged conspiracy if the evidence is otherwise relevant. *See United States v. Diaz*, 878 F.2d 608, 614 & n. 2 (2nd Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 543, 107 L.Ed.2d 540 (1989); *Mancari*, 875 F.2d at 105; *Marks*, 816 F.2d at 1209.

■ Cross, however, also contends that even if the correspondence were relevant,

---

**53.** We must note, however, that the court is disturbed by the somewhat careless and slipshod fashion in which government agents dealt with Cross, who even then was a notorious confidence artist.

**54.** The government presented evidence that Cross's ulterior motive in pretending to act as an informant was not only to avoid criminal punishment if the Tampa hoax were detected, but also to further the scheme itself: A then-fellow prison inmate testified that Cross had told him that he was attempting to parlay his cooperation with a Senate subcommittee investigating child pornography into a parole in the New York area, where Cross hoped to establish a phony office in order to take additional nude pictures of the Tampa girls and sexually molest several of them.

**55.** Rule 404(b) provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible to for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowl-

edge, identity, or absence of mistake or accident.

**56.** Such evidence is relevant if "offered for ... a proper purpose," and if "the jury can reasonably conclude the act occurred and that the defendant was the actor." *Huddleston*, 485 U.S. at 688–89, 108 S.Ct. at 1500–01. Here, there is no question that Cross authored and mailed the letters at issue.

**57.** The indictment alleges that the conspiracy stretched from October 1980 to May 1983. Cross's correspondence with Lodge dated back only as far as 1975.

**58.** Proof of such intent was essential to the government's case against appellants on both the conspiracy and mail fraud counts. Lodge's defense at trial challenged the government's case on this issue by suggesting that Lodge was a passive recipient of the Tampa photos from Cross and that he never planned to process or market these pictures. Similarly, Cross suggested that he obtained the Tampa photos with the legitimate intent of casting an actual documentary film.

the probative value of these and other, post–1980 letters used against him by the government was substantially outweighed by their unfair and unduly prejudicial impact on the jury. *See* Federal Rule of Evidence 403.[59] Cross points, in particular, to some of the letters' sexual references to children, and argues that their admission created an unacceptable risk that the jury convicted simply because he was a pedophile. A conviction will not be set aside because of a district court's refusal to exclude evidence under Rule 403 absent a clear abuse of discretion. *Cauchon v. United States*, 824 F.2d 908, 913–14 (11th Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). Indeed, Rule 403 is "an extraordinary remedy which should be used sparingly," and the trial court's discretion to exclude evidence as unduly prejudicial is "narrowly circumscribed." *United States v. Norton*, 867 F.2d 1354, 1361 (11th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989). The "major function" of Rule 403 "is limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *United States v. Sawyer*, 799 F.2d 1494, 1506 (11th Cir.1986), *cert. denied*, 479 U.S. 1069, 107 S.Ct. 961, 93 L.Ed.2d 1009 (1987), *quoting United States v. Thevis*, 665 F.2d 616, 633–34 (5th Cir. Unit B), *cert. denied*, 456 U.S. 1008, 102 S.Ct. 2300, 73 L.Ed.2d 1303 (1982).[60] As previously discussed, the correspondence was of considerable probative value in proving Lodge's and Cross's intent to create and market child pornography.[61] Moreover, because there was ample other evidence offered at trial that Cross was a pedophile and child pornographer, it is un-

likely that the references in these letters to sexual exploitation of children injected any unfair prejudice into the jury's determination of Cross's guilt. We find no error in the district court's admission of Cross's correspondence.

## VI. REFUSAL TO GRANT A CONTINUANCE

 Cross insists that he is entitled to a new trial as a result of the district court's refusal to grant a continuance to enable him to call his daughter as a witness. The decision whether to continue a trial is committed to the sound discretion of the district court. *United States v. O'Neill*, 767 F.2d 780, 784 (11th Cir.1985). The factors to be considered in evaluating such a claim of error are: (1) the diligence of the defense in interviewing the witness and procuring her testimony; (2) the probability of obtaining the testimony within a reasonable time; (3) the specificity with which the defense was able to describe the witness's expected knowledge or testimony; and (4) the degree to which such testimony was expected to be favorable to the accused, and the unique or cumulative nature of the testimony. *United States v. Costello*, 760 F.2d 1123, 1126 (11th Cir. 1985). *See also Dickerson v. Alabama*, 667 F.2d 1364, 1370 (11th Cir.), *cert. denied*, 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982).

 Cross's claim fails to satisfy several of these criteria. First, Cross was not diligent in endeavoring to secure his daughter's presence, and did not demonstrate that she would actually be available to testify within a reasonable period of time. He first indicated to the trial court that he was

---

**59.** Rule 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Unfair prejudice "means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Notes of Advisory Committee on Proposed Rule 403.

**60.** *See also United States v. King*, 713 F.2d 627, 631 (11th Cir.1983) ("in a criminal trial relevant evidence is inherently prejudicial; it is only when *unfair* prejudice *substantially* outweighs probative value that the rule permits exclusion") (emphasis in original), *cert. denied*, 466 U.S. 942, 104 S.Ct. 1924, 80 L.Ed.2d 470 (1984).

**61.** Of course, the post–1980 letters were even more crucial to the government's case, as they were offered to prove the existence of, and each appellant's membership in, the conspiracy itself.

having difficulty locating his daughter, who lived in Canada, two weeks after he had begun to present his defense, on the day he rested his case. At such time, the court granted Cross a five-day continuance, indicating that he would be allowed to re-open his case during or after Lodge's defense in order to call his daughter as a witness, but that if she were not available on that date, the trial would be completed and the case submitted to the jury. On the day that Cross's daughter was supposed to appear, he moved for another continuance on the ground that she had been forced to remain in Canada to care for a sick relative. Cross did not specifically indicate to the court when his daughter would be available to testify.[62] Refusing to further delay the trial, the court denied Cross's motion.

Second, his daughter's testimony would have been, at best, cumulative and of marginal benefit to Cross's defense. Cross contends that she would have testified that he had, in the 1950's and 60's, been a legitimate film producer and had intended to produce a documentary similar to the one that was the subject of the Tampa hoax. Such evidence, however, would have been of little relevance to the question of whether, decades after the events claimed by his daughter, Cross obtained nude photos from the young models in order to create child pornography. Indeed, the evidence at trial that Cross's activities were not aimed at producing a legitimate film was overwhelming. Moreover, two other witnesses, the head of the talent agency and the Tampa photographer hired by Cross, each testified that he indeed demonstrated a professional familiarity with the film business and appeared to be a knowledgeable, experienced producer. The district court did not abuse its discretion in refusing to grant Cross a second continuance.

## VII. EXPERT TESTIMONY

Cross next argues that he is entitled to a new trial because the district court erred in admitting irrelevant, cumulative, and unfairly prejudicial expert testimony by Kenneth Lanning, an FBI agent, on the characteristic behaviors of pedophiles. A trial court has wide discretion in determining whether to exclude expert testimony, and its action will be sustained on appeal unless "manifestly erroneous." *United States v. Burchfield,* 719 F.2d 356, 357 (11th Cir.1983) (per curiam). *See also Hamling v. United States,* 418 U.S. 87, 108, 94 S.Ct. 2887, 2903, 41 L.Ed.2d 590 (1974); *United States v. Bagnell,* 679 F.2d 826, 833 (11th Cir.1982), *cert. denied,* 460 U.S. 1047, 103 S.Ct. 1449, 75 L.Ed.2d 803 (1983). A properly qualified expert witness may testify regarding his specialized knowledge in a given field if it "would assist the trier of fact to understand the evidence or to determine a fact in issue." [63] Federal Rule of Evidence 702. *See United States v. Rouco,* 765 F.2d 983, 995 (11th Cir.1985) (expert may be used if his testimony can offer something "beyond the understanding and experience of the average citizen"), *cert. denied,* 475 U.S. 1124, 106 S.Ct. 1646, 90 L.Ed.2d 190 (1986); *Burchfield,* 719 F.2d at 357 (expert testimony admissible where it is "the kind that enlightens and informs lay persons without expertise in a specialized field"). *See also* Notes of Advisory Committee on Proposed Rule 702.

In regards to the California photos that were the subject of Count II of the indictment, Lanning testified that these pictures would be of sexual interest to pedophiles and offered his expert opinion that they were obscene. Count II charged both Cross and Lodge with mailing obscene material in violation of 18 U.S.C.A. § 1461

---

62. Although Cross contends that he suggested only a one- or two-day postponement, his request was more of an open-ended one, as he asked to call his daughter as a witness "during the next two dates, possibly, whenever she is available to come."

63. Cross has not challenged on appeal Lanning's qualifications as an expert on pedophilia. At the time of trial, Lanning was a supervisory special agent assigned to the behavioral science unit at the FBI Academy. He had specialized for some time in training, research, and consultation involving the criminal victimization of children.

(1984), and the obscenity of these photos was an essential element of the offense. It is well settled that such expert testimony is permissible in an obscenity prosecution, particularly when "contested materials are directed at ... [such] a bizarre deviant group that the experience of the trier of fact would be plainly inadequate to judge whether the material appeals to the prurient interest." *Bagnell,* 679 F.2d at 833, *quoting Paris Adult Theatre I v. Slaton,* 413 U.S. 49, 56 n. 6, 93 S.Ct. 2628, 2634 n. 6, 37 L.Ed.2d 446 (1973).[64] *Accord Hamling,* 418 U.S. at 108, 94 S.Ct. at 2903; *United States v. Petrov,* 747 F.2d 824, 830 (2nd Cir.1984), *cert. denied,* 471 U.S. 1025, 105 S.Ct. 2037, 85 L.Ed.2d 318 (1985).

Lanning's testimony was also helpful to the jury and relevant to its consideration of the conspiracy and mail fraud charges against Cross. In his defense at trial, Cross contended that the Tampa photos were innocent "nude studies," rather than child pornography, and that he had arranged them for the purpose of casting a legitimate film. In describing the habits of pedophiles, Lanning testified that such persons characteristically derive sexual satisfaction from and collect even such ostensibly non-sexual nude photographs of children. Lanning also told the jury that these kinds of pictures, rather than more graphic ones, are frequently published in ·magazines distributed to pedophiles in an attempt to circumvent laws against obscenity and child pornography.[65] Such evidence clearly shed light on one of the critical issues in the case—whether Cross obtained the photos with the intention of using them to produce and distribute child pornography. Indeed, federal courts have ordinarily allowed law enforcement officials "to testify as experts ... to establish the *modus operandi* of particular crimes," in order to "explain the actions of the defendants." [66] *Burchfield,* 719 F.2d at 358 (counterfeiters). *Accord United States v. Thomas,* 676 F.2d 531, 538 (11th Cir.1982) (drug couriers); *United States v. White,* 890 F.2d 1012, 1014 (8th Cir.) (same), *cert. denied,* — U.S. ——, 110 S.Ct. 3254, 111 L.Ed.2d 763 (1990); *United States v. Anderson,* 851 F.2d 384, 392–93 (D.C.1988) (pimps and prostitutes), *cert. denied,* 488 U.S. 1012, 109 S.Ct. 801, 102 L.Ed.2d 792 (1989).[67]

---

**64.** *See Mishkin v. New York,* 383 U.S. 502, 508, 86 S.Ct. 958, 963, 16 L.Ed.2d 56 (1966) ("Where the material is designed for and primarily disseminated to a clearly defined deviant sexual group, rather than the public at large, the prurient-appeal requirement ... is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group").

**65.** Lanning also indicated that, in communicating with one another, pedophiles often employ the term, "nude studies"—a phrase repeated in Cross's letters—as a "code word," to refer to such non-obscene photographs of children. *See United States v. Alfonso,* 552 F.2d 605 (5th Cir.) (appropriate to allow expert in gambling to testify with respect to meaning of "gambling jargon" contained in recorded telephone conversations), *cert. denied,* 434 U.S. 857, 98 S.Ct. 179, 54 L.Ed.2d 129 (1977). Furthermore, his testimony regarding the obsession of pedophiles with exchanging stories and photographs with a network of others who share their sexual interest in children helped to explain the genesis and odd character of appellants' relationship, particularly the fact that they had cooperated in a complex, risky, criminal conspiracy although they had never met and knew little about one another.

**66.** In quoting, from *United States v. Gillespie,* 852 F.2d 475, 480 (9th Cir.1988), dicta that "testimony of criminal profiles is highly undesirable as substantive evidence," Cross confuses *modus operandi* evidence with evidence regarding factors which allegedly predict criminal conduct. The expert testimony at issue in *Gillespie* did not touch upon the characteristic behaviors of child molesters, but rather the typical child molester's family background. *See also United States v. White,* 890 F.2d 1012, 1014 (8th Cir.) (same) (recognizing that predictive profiles are "inherently prejudicial because of the potential they have for including innocent citizens," but distinguishing challenged expert testimony as "*modus operandi*" evidence), *cert. denied,* — U.S. ——, 110 S.Ct. 3254, 111 L.Ed.2d 763 (1990).

**67.** The decision in *Anderson,* involving a defendant charged with transporting minors for prostitution, is particularly applicable to this case. There too, expert testimony was presented to rebut the defendant's claim that his conduct was innocent rather than criminal. The court held that expert testimony regarding "pimping patterns and the pimp-prostitute relationship," was properly admitted to assist the jury in evaluating the defendant's contention that he was "merely a gambler with a flashy lifestyle and a penchant for travel." *Id.,* 851 F.2d at 393.

Lanning's testimony on these matters was also proper.

Cross, however, also insists that even if Lanning's testimony were relevant and helpful to the jury, it should nevertheless have been excluded under Federal Rule of Evidence 403 because its probative value was substantially outweighed by its undue prejudice and tendency to mislead the jury. *See Rouco*, 765 F.2d at 995. Cross specifically suggests that Lanning's testimony created an unacceptable risk that the jury convicted him simply out of disgust for pedophilia. As the court has already recognized in its discussion of Cross's claim of error regarding admission of his correspondence,[68] a conviction will not be overturned on the basis of a violation of Rule 403 absent a clear abuse of discretion. *Cauchon v. United States*, 824 F.2d 908, 913–14 (11th Cir.), *cert. denied*, 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). This rule is "an extraordinary remedy which should be used sparingly," and, indeed, the trial court's discretion to exclude evidence as unduly prejudicial is "narrowly circumscribed." *United States v. Norton*, 867 F.2d 1354, 1361 (11th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 200, 107 L.Ed.2d 154 (1989). As noted above, Lanning's testimony on the obscene nature of the California photos and the sexual appeal and marketability of the Tampa pictures to pedophiles was of considerable probative value in proving each of the charges contained in the indictment. Moreover, because there was extensive, particularized evidence of Cross's sexual attitudes toward children of-fered at trial by the government and, indeed, by Cross himself, it is doubtful that Lanning's more generalized testimony about the nature of pedophilia could have independently affected the jury's verdict. *See Anderson*, 851 F.2d at 394. The jurors were instructed to determine for themselves the weight to be given the opinion of each expert witness. *See Burchfield*, 719 F.2d at 358. We find no error in the district court's admission of Lanning's testimony over Cross's Rule 403 objection.[69]

## VIII. CO–CONSPIRATOR HEARSAY

■ In his initial *pro se* brief, Cross complains that the district court improperly admitted certain hearsay statements made to law enforcement officers by Diwan and Lodge. At trial, a prison inspector and state police official from Florida each testified that Diwan provided and identified for them certain documents that the government later introduced as exhibits at trial, including a package of nude photographs which Diwan indicated she had received from the Tampa photographer. In addition, Seattle Detective Thomas Dittmar also testified that at the time he and other officers searched Lodge's home, Lodge acknowledged to him that he collected child pornography, knew Cross, and that the dummy corporation created as a front for the Tampa photo scheme had been Cross's idea.

An out-of-court statement by a co-conspirator is admissible under both Federal Rule of Evidence 801(d)(2)(E)[70] and the

---

**68.** *See* section V(B) of the court's opinion.

**69.** Cross also complains that the district court failed to caution the jury against considering Lanning's testimony as evidence of Cross's bad character or disposition to commit the crimes charged. However, neither Cross nor Lodge ever requested such a limiting instruction, and the failure of the court to provide one, *sua sponte*, was not plain error. *See Burchfield*, 719 F.2d at 358. *See also United States v. Alvarez*, 837 F.2d 1024, 1030 (11th Cir.) (admission of evidence is plain error where it "seriously impaired the fairness or integrity of the trial"), *cert. denied*, 486 U.S. 1026, 108 S.Ct. 2003, 100 L.Ed.2d 234 (1988).

Similarly, Cross failed to object at trial to Lanning's comment that the FBI would not allow an informant to molest children or other-wise violate the law, although he now claims on appeal that the admission of such testimony was reversible error. Read in context, Lanning mentioned "molestation" only as an example of criminal conduct, and never alleged or implied that Cross was accused of physically abusing children. Such a brief, non-suggestive reference was itself hardly damaging to Cross, and the trial court's failure to order the jury to disregard it was not plain error.

**70.** Rule 801(d)(2)(E) provides that "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not considered hearsay.

Confrontation Clause of the Sixth Amendment if the trial judge determines that the government has proven by a preponderance of the evidence that (1) "the declarant and the defendant were involved in an existing conspiracy," and (2) "the statement was made in furtherance of that conspiracy." [71] *United States v. Jones*, 913 F.2d 1552, 1563 (11th Cir.1990). *See also Bourjaily v. United States*, 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987). Although we are bound to apply a "liberal standard" in determining whether a statement was made in furtherance of a conspiracy, *see United States v. Byrom*, 910 F.2d 725, 735 (11th Cir.1990), it is clear that these statements by Diwan and Lodge were admissions after the conspiracy had effectively ended, and as such, were not made "in furtherance of that conspiracy." [72] The district court's finding to the contrary was clearly erroneous. *See United States v. Turner*, 871 F.2d 1574, 1581 (11th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 552, 107 L.Ed.2d 548 (1989).

 However, this conclusion does not end our inquiry. It is well-established that the improper admission of co-conspirator hearsay, like other Confrontation Clause errors, is subject to the harmless error rule of *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *Turner*, 871 F.2d at 1581–82. *See also Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 1438, 89 L.Ed.2d 674

(1986). We find that Cross is not entitled to prevail on appeal, despite the district court's erroneous failure to exclude these statements, because there is "no reasonable probability" that such evidence "might have contributed to [his] conviction[s]." *Turner*, 871 F.2d at 1582, *quoting Fahy v. Connecticut*, 375 U.S. 85, 86–87, 84 S.Ct. 229, 230–31, 11 L.Ed.2d 171 (1963).[73] *See also United States v. Petit*, 841 F.2d 1546, 1557 (11th Cir.), *cert. denied*, 487 U.S. 1237, 108 S.Ct. 2906, 101 L.Ed.2d 938 (1988); *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir.1988). Diwan's and Lodge's statements to law enforcement officers were of little significance to the case against Cross. The government presented abundant, independent proof of the inculpatory facts referred to in these statements, namely, that the Tampa photographer had conveyed nude photos to Cross, and that Cross had hatched the idea of chartering a corporation to disguise his pornographic enterprise. Moreover, because the evidence of Cross's guilt on all counts was so overwhelming, we can be virtually certain that the admission of these statements did not influence the jury's verdict. Cross is not entitled to a new trial, because the error in question was "harmless beyond a reasonable doubt." *See Turner*, 871 F.2d at 1582; *United States v. Pendegraph*, 791 F.2d 1462, 1465 (11th Cir.), *cert. denied*, 479 U.S. 869, 107 S.Ct. 235, 93 L.Ed.2d 160

**71.** Cross also contends that the district court should have determined the admissibility of these statements by conducting a hearing prior to permitting the government to introduce them into evidence. *See United States v. James*, 590 F.2d 575 (5th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979). However, the law in this circuit does not require a separate hearing prior to the government's presentation of such proof. *United States v. Allison*, 908 F.2d 1531, 1534 n. 2 (11th Cir.1990); *United States v. Sanchez*, 722 F.2d 1501, 1507 (11th Cir.), *cert. denied*, 467 U.S. 1208, 104 S.Ct. 2396, 81 L.Ed.2d 353 (1984). Here, it was sufficient that the district court admitted these and other statements by Diwan and Lodge on the government's assurance that they would be connected to a conspiracy, and that the court ruled at the close of the government's case that the evidence was admissible.

**72.** Although Cross does not object to other statements by Diwan, introduced by the government

in the form of hearsay through the testimony of parents of the Tampa models, we note that such evidence, in contrast, was properly admitted. Diwan communicated with the parents while masquerading as an assistant to Cross's film project and for the purpose of obtaining nude photographs of the models. The government provided ample evidence of her participation in the conspiracy, and also proved that she made these statements to the parents in furtherance of the conspiracy.

**73.** "Factors to consider" in determining whether the error was "harmless beyond a reasonable doubt" include "the importance of the evidence to the prosecution, whether the evidence was cumulative, and the overall strength of the prosecution's case." *Turner*, 871 F.2d at 1582. *See also Van Arsdall*, 475 U.S. at 684, 106 S.Ct. at 1438.

(1986). *See also United States v. Weinstein*, 762 F.2d 1522, 1535 (11th Cir.1985), *cert. denied*, 475 U.S. 1110, 106 S.Ct. 1519, 89 L.Ed.2d 917 (1986).

## IX. RECANTED TESTIMONY

■ Cross contends that Warren Mumpower, a former fellow inmate and government witness, has since recanted the testimony he gave at Cross's trial.[74] However, the proper procedure for presenting such newly discovered evidence would have been to file a motion for a new trial in the district court. *See* Fed.R.Crim.P. 33. Cross has failed to pursue this avenue and it is now closed to him, as the prescribed two-year period in which to move for a new trial under Rule 33 has expired.[75] This court cannot consider a claim that rests on factual allegations outside the record which the district court has never considered. *See United States v. Costa*, 890 F.2d 480, 483 (1st Cir.1989); *United States v. Lara-Hernandez*, 588 F.2d 272, 275 (9th Cir. 1978).[76] As a federal prisoner, Cross is free to bring a habeas corpus action in the district court, under 28 U.S.C.A. § 2255, collaterally attacking his convictions on the basis of Mumpower's alleged perjury. *See id.*

## X. PROSECUTORIAL MISCONDUCT

■ We now dispose of Cross's final claim that he is entitled to a new trial because the prosecution improperly obtained his sealed witness list, and colluded with Diwan's defense counsel to induce her to flee the country.[77] As a general matter, we will reverse a conviction on the basis of governmental misconduct only if the misconduct may have prejudiced substantial rights of the accused. *United States v. Collins*, 779 F.2d 1520, 1534 (11th Cir. 1986). Specifically, the government's improper acquisition of defense strategy is fatal to a conviction only where there was "a realistic possibility of injury to [the defendant] or benefit to the State." *United States v. Franklin*, 598 F.2d 954, 956 (5th Cir.), *cert. denied*, 444 U.S. 870, 100 S.Ct. 147, 62 L.Ed.2d 95 (1979), *quoting Weatherford v. Bursey*, 429 U.S. 545, 558, 97 S.Ct. 837, 845, 51 L.Ed.2d 30 (1977). In this case, Cross submitted to the district court, *ex parte*, a list of witnesses he wished to call together with a description of the relevant, anticipated testimony of each one, in order to obtain subpoenas and expenses for these witnesses. Cross himself admitted that this document was unsealed when received by the clerk of the district court, although he insists that it was sealed when filed by his standby counsel. Even if it were true that, as Cross alleges, the witness list was later revealed to the FBI agent assigned to the case, Cross did not demonstrate that the agent or any member of the prosecutorial team was responsible for unsealing the document, or that it was unsealed other than by accident. This does not amount to governmental misconduct. Moreover, Cross has failed to describe how the revelation of his witness list prejudiced his case, and he has not contradicted the government's contention that they already knew the nature of his defense and the identities of many of his witnesses. Presented with these alle-

---

**74.** Cross cites a purported August 1987 letter by Mumpower, sent to Diwan's attorney and the district judge, in which he threatens to "consider full recantation of all testimony given in the cause of U.S. v. Eric Cross," unless government officials improve the conditions of his confinement. Cross has also submitted with his reply brief a copy of an affidavit by another inmate, who claims Mumpower admitted to perjuring himself at Cross's trial.

**75.** Rule 33 provides that a motion for a new trial based on newly discovered evidence must be made no later than two years after final judgment. Cross was sentenced on May 16, 1986 and, therefore, would have had to file his

motion no later than May 16, 1988. Although Cross's appeal was pending during this period, he was free to move this court to remand his case back to the district court to enable him to file his new trial motion. *See* Fed.R.Crim.P. 33; *United States v. Khoury*, 901 F.2d 975, 976, *modified on denial of reh'g*, 910 F.2d 713 (11th Cir.1990).

**76.** Neither of the documents on which Cross relies—the letter from Mumpower and the other prisoner's affidavit—are part of the record on appeal.

**77.** Cross filed a pre-trial motion to dismiss the indictment on these grounds.

gations, the district court properly denied Cross's motion to dismiss the indictment on the basis of the unsealed witness list.[78]

▉▉▉ As for the other element of Cross's misconduct claim, it is true that government intimidation of defense witnesses can constitute a denial of due process. *See United States v. Terzado-Madruga,* 897 F.2d 1099, 1108 (11th Cir.1990); *United States v. Stewart,* 820 F.2d 370, 375 (11th Cir.1987). *See also United States v. Valenzuela-Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). The district court held several hearings to inquire into allegations by Cross that the government had deprived him of favorable testimony from Diwan by colluding with her defense attorney to persuade her to abscond rather than face trial. Although testimony by Cross and Diwan,[79] together with a purported transcript of one of Diwan's conversations with her attorney, indicates that the attorney may have suggested to Diwan that she consider leaving the country, there was no evidence whatsoever that the government induced the attorney to make this suggestion, or otherwise colluded with Diwan's counsel.[80] We concur in the district court's finding that Cross's witness intimidation claim has no merit.

## CONCLUSION

Accordingly, the judgment of the district court is AFFIRMED.

---

78. The district court heard oral argument from Cross and the government on this issue. Although the court denied Cross's request that an evidentiary hearing be held to allow his standby counsel to testify that the witness list was sealed when it was filed, we have, in deciding this claim, accepted Cross's allegation that the witness list was filed in a sealed condition.

79. Before she fled the country, Diwan testified regarding her concerns that her attorney was colluding with the prosecution at a hearing on her request to be appointed new counsel.

80. Cross complains that the district court failed to order that cassette tapes contained in Diwan's bank safety deposit box be turned over to the court. He claimed that the tapes were a recording of the conversation in which Diwan's attorney told her to consider absconding. Cross furnished the district court with a transcript of the alleged conversation, which the court refused to consider on grounds of lack of authentication and Diwan's attorney-client privilege, but which was made part of the record for appellate review. Because we have taken into account the contents of the transcript in determining that there was no proof of government misconduct, we need not address Cross's argument that the district court erred in failing to subpoena the tapes.