[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 14-15596

_____

D.C. Docket No. 0:14-cr-60080-JEM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

JESSE LEWIS,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(February 28, 2019)

Before MARCUS, JILL PRYOR and SILER,[*] Circuit Judges.

PER CURIAM:

_____

[*] The Honorable Eugene E. Siler, Jr., Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

A jury convicted Jesse Lewis of two counts of sex trafficking by force, threats of force, fraud, and/or coercion, in violation of 18 U.S.C. § 1591(a), and one count of using, carrying, and possessing a firearm in furtherance of a crime of violence and brandishing that firearm, in violation of 18 U.S.C. § 924(c)(1)(A), (c)(3)(B).  On appeal, Lewis challenges the impanelment of a juror and the admission of various of items of evidence.  He also argues that the district court abused its discretion by denying him a continuance to present a witness, that the government's improper remarks in its closing argument deprived him of a fair trial, that his conviction under § 924(c) is invalid on statutory and constitutional grounds, and that cumulative error tainted his trial.  Finally, he argues that the district court made numerous errors in sentencing him.  Having thoroughly reviewed the record, and with the benefit of oral argument, we affirm.

## I.    FACTUAL BACKGROUND

### A.    Lewis's Trafficking of Tracie Bertie (Counts 1 and 3)

Lewis met Tracie Bertie in July 2010, shortly after she lost her job as a nanny.  At the time, Bertie was a Brazilian national present in the United States who had overstayed her visa.  She and Lewis soon entered a relationship, and she moved in with him.  Lewis told Bertie he could get her a dancing job.  Bertie did not realize that Lewis wanted her to prostitute herself until he drove her to a client's house.  Lewis gave Bertie condoms and told her to have sex with the client.

Bertie, though afraid, did what she was told.  Lewis arranged additional prostitution appointments for Bertie; after initially allowing her to keep the earnings, he later began to pocket them himself, telling Bertie he was saving the money for her.  Lewis set the prices for Bertie's prostitution appointments.

Lewis booked Bertie a room at a Red Roof Inn in Broward County, Florida, where for about two months she met clients and spent time alone.  Lewis and an associate of his named Sadé Patterson arranged prostitution appointments for Bertie.  A Red Roof employee named Fausto Silva, whom Bertie befriended, once observed a bruise on Bertie's arm, but never asked her about it.  Bertie and Silva spoke regularly, but when Lewis's car approached, Bertie would tell Silva that she had to leave and would run up to her room.

Bertie told Lewis she did not want to sleep with strangers for money; he responded that she could not leave and that he would punish her if she refused.  He told Bertie that, for each prostitution appointment she had to receive payment first, must use condoms whenever having sex, and could not kiss another man or look at his eyes.  When Bertie disobeyed Lewis, he would call her names, choke her, and pull her hair.  Lewis also monitored Bertie's phone, required her to seek his permission before going anywhere, and took her passport, which he returned only when he was satisfied that she would behave as he wanted.

3

Bertie regularly slept with at least five clients a day and had over 100 client appointments during her time under Lewis's control. The appointments included two, which Lewis arranged, with a client she knew only as "Master," a man who locked Bertie in his house, forced her to ingest cocaine, and pulled her hair. The second time Bertie saw Master, she was accompanied by a fellow prostitute named China. Lewis knew Master scared Bertie, but he forced her to see Master anyway.

Bertie and Lewis moved to a house in North Miami. Once, Bertie tried to escape, but Lewis discovered her plans. He choked her, called her names, threatened to cut and kill her, hit her on the head with a gun, and pointed the gun at her face. Lewis locked Bertie in the trunk of his car and told her he would find and kill her brother. She found the trunk's release button and escaped, but Lewis found her before she could contact the police, ordered her back into the car, and drove her back to the house. A neighbor, observing the scene, called the police, who arrived at Lewis's house. Lewis instructed Bertie to lie to the police, threatening to kill her brother if she did not obey. Bertie complied, telling the police she had been running down the street because her grandmother had died and she had gone temporarily crazy. The police left after observing no bruises on Bertie and having received her assurance that she was safe. Lewis locked Bertie in a room for two days, letting her leave only under supervision.

Bertie and China were arrested together in Miami Beach in December 2010 after China propositioned an undercover police officer.  An immigration hold was placed on Bertie, and she was detained at the Broward Transitional Center.  While awaiting deportation proceedings, she told her attorney and later federal law enforcement officials about her captivity under Lewis.  When Lewis visited Bertie while she was in custody, she did not tell him about her meetings with law enforcement, as she feared he might harm her brother.  The government eventually dropped the immigration charges against Bertie, released her from custody, granted her legal status, and allowed her to remain in the United States.  Law enforcement officials told Bertie not to contact Lewis upon her release.  She nonetheless went back to Lewis and slept with him—in part, she explained, because she felt lost and afraid, and in part so that he would not harm her brother.

**B.    Lewis's Trafficking of Kimberly Askinazi (Count 2)**

Askinazi met Lewis in June 2013.  At the time, she was addicted to Dilaudid and had financial troubles.  Accompanied by a woman named Diamond, Lewis approached Askinazi outside a pharmacy in Tampa and told her he could help her if she helped him.  Believing Lewis would help her to obtain drugs, Askinazi got into his car.  Lewis bought Dilaudid pills, giving Askinazi half of one pill and keeping the rest.  The three went to a hotel, where Lewis and Diamond took photos

5

of Askinazi for an advertisement on Backpage.com, but the ad garnered no response.

Lewis and Diamond left Tampa for Broward County, bringing Askinazi with them, because they had been unsuccessful in finding customers in Tampa. Askinazi witnessed Lewis hit and attempt to choke Diamond, but she chose to not leave because Lewis was providing her with her pills. The three checked into another hotel. Lewis posted another Backpage.com ad, which garnered several responses. Lewis required Askinazi to follow certain rules of conduct at all times: she had to call him Daddy, look down in public, refrain from disrespecting him, refrain from touching the beads he wore around his neck, and refrain from blocking her face when he hit her. Lewis once slapped Askinazi for addressing him as "you," and then choked her when she did it again. When Askinazi flinched, he hit her yet again. Askinazi also observed Lewis beat Diamond for what Lewis perceived as disrespectful conduct.

Lewis and Askinazi later moved to a Sheraton hotel, where they stayed with a prostitute named Lala. Lewis became upset when Askinazi and Lala spoke with one another too frequently. He hit Askinazi twice, causing her tooth to loosen and later fall out, and choked her for disrespecting him. Lewis posted another Backpage.com ad, and Askinazi met and slept with several clients, earning $100-150 per encounter. Lewis kept Askinazi's money, cell phone, identification, and

6

pills.  Although Askinazi did not want to prostitute herself, she feared Lewis would harm or kill her if she refused.

Askinazi escaped from the Sheraton early one morning after Lewis had fallen asleep.  She called 911 and told the dispatcher that she had run away from a pimp.  A Sheriff's Deputy picked Askinazi up and took her to a rape treatment center.

## C.    Lewis's Trial

The government filed a three-count indictment against Lewis in the Southern District of Florida.  Count 1 charged Lewis with sex trafficking of Bertie by force, fraud, or coercion under 18 U.S.C. § 1591(a)(1) and (b)(1).  Count 2 alleged the same with respect to Askinazi.  Count 3 charged Lewis with using, carrying, possessing, and brandishing a firearm during and in relation to Count 1, in violation of 18 U.S.C. § 924(c)(1)(A), (c)(3)(B).

Before trial, Lewis moved to suppress evidence from cell phones that he alleged were seized in an unconstitutional search of his hotel room.  The district court granted the motion, prohibiting the introduction of evidence recovered from the phones.  The government moved *in limine* to preclude Lewis from asking Askinazi about (1) pending criminal charges against her for possession of narcotics and drug paraphernalia arising out of her arrest on August 25, 2014—weeks before the trial in this case began—and (2) her potential prostitution activity after the time

alleged in the indictment, including the appearance of her photograph and phone number on a Backpage.com ad dated August 23, 2014.  Lewis moved for leave to introduce evidence of Askinazi's subsequent prostitution activity as relevant to show she engaged in prostitution for him voluntarily, without coercion.  The district court entered an order denying Lewis's motion and granting the government's motion.

Lewis's trial counsel asserted in his opening statement that the evidence would show Askinazi "had been prostituting herself like for most of her adult life . . . us[ing] sex for drugs."  Doc. 128 at 33.[1]  The government objected, and the district court sustained the objection.  Askinazi testified that she was unfamiliar with the Backpage.com ad posted while she, Diamond, and Lewis were in Tampa; when Lewis's trial counsel persisted in asking Askinazi about it, the government objected, and the district court sustained the objection.

After the jury was selected, but before the rest of the venire was dismissed or the jury was sworn, one juror, Houshiar Fayaz, told the district court that as a Muslim he could not be involved with anything involving prostitution because "certain sections of the Quran . . . say[] that prostitution is basically punishable by death."  *Id.* at 5.  The district court told Fayaz, "[T]he law that as it is presently written prohibits prostitution, so I don't think that we're going to be asking you to

---

[1] All citations to "Doc. #" refer to numbered entries on the district court's docket.

approve it or to condone it in any way." *Id.* at 6.  The court asked Fayaz if he could "follow the instructions of the court on the law and do your best to give us a fair and impartial verdict," and Lewis's trial counsel asked if Fayaz could "be fair and impartial in listening to this case." *Id.*  Fayaz responded "Yes" to both inquiries. *Id.*

At trial, the government introduced evidence that, in 2013, Lewis had been arrested on and found guilty of two prostitution-related charges under Florida law, unrelated to the conduct charged here, on which adjudication had been withheld. An undercover police detective testified that he had arrested Lewis and a prostitute at a hotel after responding to a Backpage.com ad.  The detective testified that he had recovered from Lewis a small pistol loaded with a single bullet, for which Lewis had a permit, and that the police had seized Lewis's phone and, after obtaining a warrant, searched its contents and downloaded all of its photographs and data.

The government presented psychologist Dr. Steven Gold to testify as an expert in trauma psychology.  Gold testified on the general characteristics of, psychological underpinnings of, and trauma associated with forced prostitution, including the manner of control and intimidation that abusers tend to exercise over their victims.  Gold also said that abusive pimps sometimes groom prostitutes, and that an abuse victim may return to an abuser due to an emotional bond formed

through trauma.  Gold acknowledged that he had met neither Askinazi nor Bertie, nor read any reports about them.

The government also presented the testimony of a pimp named Michael Eutsey, who said that Lewis had once called him on the phone and offered to sell him China's sexual services.  Eutsey testified that he declined Lewis's offer, and that roughly an hour later, Lewis arrived at his house with China and another man, who fired a gun.  Eutsey also testified as to common business practices among pimps, including as to the manner in which aggressive pimps maintain control over their prostitutes.

After the government presented its case, Lewis's trial counsel sought a continuance of three hours and nine minutes to secure the attendance of Sadé Patterson, who was undergoing a dental procedure at the time.  Lewis had failed to subpoena Patterson or otherwise secure her attendance.  Lewis's counsel proffered to the court that Patterson would offer exculpatory testimony about Lewis's relationship with Askinazi—namely, that she had observed Lewis and Askinazi together, that Lewis had not been forcing Askinazi to prostitute herself, and that Askinazi had seemed happy with Lewis.  Lewis told the district court that he had asked his counsel to secure Patterson's attendance two days earlier.  The district court denied Lewis a continuance.

Lewis presented no defense, and the jury returned a verdict of guilty on all counts.  At sentencing, Lewis told the court that he was unprepared and needed new counsel, asserting ongoing conflicts with his trial counsel.  The probation office prepared a presentence investigation report ("PSR") for Lewis, recommending a sentencing range of 324-405 months for Counts 1 and 2 and a consecutive seven-year term for Count 3.  The district court imposed a 444-month sentence with lifetime supervised release to follow—360 months for Counts 1 and 2, and 84 months for Count 3.

This is Lewis's appeal.

## II.    STANDARDS OF REVIEW

We review questions of constitutional law and statutory construction *de novo*.  *United States v. Ibarguen-Mosquera*, 634 F.3d 1370, 1383 (11th Cir. 2011); *United States v. Brown*, 364 F.3d 1266, 1268 (11th Cir. 2004).  We review unpreserved challenges, however, for plain error.  *United States v. Turner*, 474 F.3d 1265, 1275 (11th Cir. 2007).  "Under the plain error standard, the defendant must show that (1) an error occurred; (2) the error was plain; (3) it affected his substantial rights; and (4) it seriously affected the fairness of the judicial proceedings."  *United States v. Flanders*, 752 F.3d 1317, 1333 (11th Cir. 2014).  An error is plain when it "is obvious and is clear under current law."  *United States v. Carpenter*, 803 F.3d 1224, 1238 (11th Cir. 2015) (internal quotation marks

11

omitted).  "Where neither the Supreme Court nor this Court has ever resolved an issue, and other circuits are split on it, there can be no plain error in regard to that issue."  *Id.* at 1238-39 (alteration adopted) (internal quotation marks omitted).

"We review evidentiary rulings for abuse of discretion.  An abuse of discretion occurs if the district court applies an incorrect legal standard or makes findings of fact that are clearly erroneous."  *United States v. Wilk*, 572 F.3d 1229, 1234 (11th Cir. 2009) (citations omitted).  A district court also abuses its discretion by "ma[king] a clear error of judgment."  *United States v. Frazier*, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).  But "where . . . a defendant fails to preserve an evidentiary ruling by contemporaneously objecting, our review is only for plain error."  *United States v. Turner*, 474 F.3d 1265, 1275 (11th Cir. 2007).

"The decision whether to continue a trial is committed to the sound discretion of the district court," and we review the denial of a continuance for abuse of that discretion.  *United States v. Cross*, 928 F.2d 1030, 1048-49 (11th Cir. 1991).

"The Court reviews a prosecutorial misconduct claim *de novo* because it is a mixed question of law and fact."  *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006).  But we review unpreserved claims of prosecutorial misconduct for plain error.  *United States v. Flanders*, 752 F.3d 1317, 1332-33 (11th Cir. 2014).

We review the total prejudicial effect of cumulative error *de novo* to determine whether reversal is warranted, considering both preserved and unpreserved errors. *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007). A preserved error of constitutional magnitude that occurs during the presentation of a case to a jury requires that we reverse and remand for a new trial unless the government can prove that the error was harmless beyond a reasonable doubt. *Arizona v. Fulminante*, 499 U.S. 279, 295-96 (1991) (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)); *United States v. Margarita Garcia*, 906 F.3d 1255, 1263 (11th Cir. 2018). "Where . . . a district court conducts an inquiry into the merits of a criminal defendant's motion for new counsel, we review [its] ruling for abuse of discretion." *United States v. Calderon*, 127 F.3d 1314, 1343 (11th Cir. 1997).

"The district court's interpretation of the sentencing guidelines is subject to *de novo* review on appeal, while its factual findings must be accepted unless clearly erroneous." *United States v. Ellis*, 419 F.3d 1189, 1192 (11th Cir. 2005) (emphasis added) (internal quotation marks omitted). But unpreserved sentencing challenges are reviewed only for plain error. *United States v. Beckles*, 565 F.3d 832, 842 (11th Cir. 2009).

## III.   ANALYSIS

### A.   The District Court Did Not Impanel A Biased Juror.

Lewis argues that the district court erred in impaneling a juror whose religion required that involvement with prostitution be punished by death.  A juror's religious beliefs do not render him incapable of impartial service, however, so long as he can set those beliefs aside when necessary to render a verdict based on the evidence presented.  Here, juror Fayaz assured the court that he could render a fair and impartial verdict, and we see no basis in the record to conclude otherwise.  The district court thus did not err in impaneling the juror.

The Sixth Amendment requires that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." U.S. Const. amend. VI.  "The constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors." *Murphy v. Florida*, 421 U.S. 794, 799 (1975) (internal quotation marks omitted).  "It is sufficient [to satisfy this standard] if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 800 (internal quotation marks omitted).  "[T]he seating of any juror who should have been dismissed for cause . . . require[s] reversal." *United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000).

14

Fayaz told the district court that his religious beliefs mandate death as punishment for involvement with prostitution.  The district court told Fayaz that he need not "support[,] . . . condone[,] . . . or hav[e] anything to do with" prostitution; then asked whether Fayaz could "follow the instructions of the court on the law and do [his] best to [return] a fair and impartial verdict."  Doc. 128 at 6.  Fayaz responded with an unambiguous "Yes."  *Id.*  Although "[a] juror's assurances that he is equal to this task cannot be dispositive," Lewis has failed to demonstrate by evidence "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality."  *Murphy*, 421 U.S. at 800 (internal quotation marks omitted).  The record gives us no reason to doubt Fayaz discharged his duties faithfully and impartially.  In light of Fayaz's assurance that in reaching a verdict he would lay aside any personal or religious objections to Lewis's conduct, we will not indulge in baseless speculation that he could not or would not do so.  The district court thus did not err in impaneling Fayaz.

## B.    The District Court Did Not Err in Admitting Two Photographs Purportedly Recovered from Unconstitutionally-Seized Cell Phones.

Lewis argues that the district court erred in admitting two photographs that he asserts the government obtained through an unconstitutional search.  Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."  U.S. Const. amend. IV.  "[C]ourts must suppress evidence obtained in

15

violation of the Fourth Amendment." *United States v. Gilbert*, 942 F.2d 1537, 1541 (11th Cir. 1991). "The burden is on the movant to make specific factual allegations of illegality, to produce evidence, and to persuade the court that the evidence should be suppressed." *United States v. Evans*, 572 F.2d 455, 486 (5th Cir. 1978). "[U]nsubstantiated speculation[,] . . . standing alone, fails to meet even [a] defendant's initial burden of persuading the court that the evidence should be suppressed." *United States v. Nixon*, 918 F.2d 895, 904 (11th Cir. 1990).

It is undisputed that the June 27, 2013 hotel room search and the seizure of several phones found in Lewis's possession violated Lewis's Fourth Amendment rights. Lewis offered no evidence, however, that the government found the photographs whose admission he challenges on the unconstitutionally-seized phones, and so he has failed to meet his burden of showing that the district court should have excluded them. *See Nixon*, 918 F.2d at 904; *Evans*, 572 F.2d at 486. The district court did not err in admitting the photographs.

## C.     The District Court's Evidentiary Rulings Do Not Warrant Reversal or a New Trial.

Lewis argues that the district court admitted several items of evidence in violation of the Federal Rules of Evidence. The district court properly admitted each challenged item except for evidence of Lewis's prior prostitution offense, which was inadmissible. However, Lewis fails to show that the admission of this

16

evidence prejudiced him given the overwhelming evidence against him.  None of the district court's admissibility decisions warrants reversal or a new trial.

### 1.  Dr. Gold's Testimony

Lewis argues that the district court plainly erred in admitting Dr. Gold's expert testimony on the psychology of trauma because it was unrelated to the facts of the case and unduly prejudicial.  Gold's testimony assisted the jury in understanding the psychological and emotional relationships that prostitutes form with pimps; for this reason, the district court did not err in admitting it.

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if" four requirements are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.

17

Lewis argues that because the government offered no evidence that he, Askinazi, or Bertie had traits or engaged in behaviors that Gold described as typical of the pimp-prostitute relationship, Gold's testimony failed to satisfy Rule 702, as it did not assist the jury in understanding the evidence or determining a fact in issue. He also argues that because Gold had never spoken to either Askinazi or Bertie and had read no reports about them or this case, his testimony did not apply reliable principles and methods to the facts of the case. Both arguments fail for the same reason: Rule 702 allows an expert witness "to opine about a complicated matter without any firsthand knowledge of the facts in the case." *Frazier*, 387 F.3d at 1260; *see also* Fed. R. Evid. 702 advisory committee's note to 2000 amendment ("[A]n expert [may] educate the factfinder about general principles, without ever attempting to apply these principles to the specific facts of the case."). Gold's testimony could have helped the jury to contextualize Askinazi's and Bertie's relationships with Lewis and understand the trauma Lewis inflicted on them— subjects that likely are beyond an ordinary juror's knowledge or experience. *See United States v. Taylor*, 239 F.3d 994, 998 (9th Cir. 2001) ("[T]he relationship between prostitutes and pimps is not the subject of common knowledge. . . . A trier of fact who is in the dark about that relationship may be unprepared to assess the veracity of an alleged pimp, prostitute, or other witness testifying about prostitution."). Any prejudice Lewis experienced from the testimony's admission

18

did not substantially outweigh its value.  The district court did not, therefore, err in admitting Gold's testimony.

### 2.  *Eutsey's Business Practices Testimony*

Lewis argues that the district court plainly erred in admitting Eutsey's testimony as to his business practices as a pimp.  Lewis asserts that this testimony was irrelevant and unduly prejudicial.  "Evidence is relevant if:  (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Evidence satisfies this test, even if it does not demonstrate the ultimate fact sought to be proven, if it constitutes "a step on one evidentiary route to the ultimate fact."  *Old Chief v. United States*, 519 U.S. 172, 179 (1997).  Eutsey's testimony as to his business practices, and those of pimps generally, was relevant inasmuch as it corroborated and contextualized Bertie and Askinazi's testimony about Lewis's exploitation of their weaknesses to recruit, groom, and control them. By showing that Lewis's methods for manipulating prostitutes were common practice among pimps, Eutsey's testimony could have assisted the jury in understanding that such conduct likely was part of the charged forced prostitution schemes.  The district court did not err in admitting Eutsey's testimony.

19

### 3. *Eutsey's Testimony that Lewis Attempted to Sell Him An Underage Prostitute and Brought a Gunman to His Home*

Lewis argues the district court plainly erred in admitting Eutsey's testimony that Lewis tried to sell him China's sexual services[2] and came to his home with China and a second man, who fired a gun, because such testimony was irrelevant and unduly prejudicial.  Eutsey's testimony was relevant because it demonstrated that Lewis served as China's pimp, and that fact in turn buttressed Bertie's testimony that when she and China were arrested together, they both were under Lewis's control.  *See* Fed. R. Evid. 401.  Any danger of unfair prejudice from Eutsey's testimony did not substantially outweigh its probative value.  *See* Fed. R. Evid. 403.  The district court thus did not err in admitting it.

### 4. *Undated Photo of Lewis Holding a Gun*

Lewis argues that the district court plainly erred in admitting into evidence an undated photograph of him holding a firearm.[3]  Evidence that Lewis possessed a firearm at some unknown time and in some unknown context, he says, was irrelevant to the charged offenses and unduly prejudicial.  The photograph was relevant, the government argued, because it tended to corroborate Bertie's

---

[2] Lewis asserts Eutsey testified that Lewis offered to transfer ownership of China to him, but this misconstrues the record, which shows that Eutsey testified Lewis merely sought to sell him China's sexual services.

[3] We have already rejected Lewis's Fourth Amendment challenge to the photograph's admission.  *See supra* Part III.B

testimony that Lewis frequently carried a firearm, which in turn corroborated her testimony that she feared Lewis because he beat her with a firearm, held a firearm to her head, and threatened her with a firearm. *See* Fed. R. Evid. 401. Lewis says the photograph lacked relevance because Bertie did not testify that (1) Lewis used the depicted firearm in committing a charged offense, (2) she was present when the photograph was taken, or (3) she knew when or in what context the photograph was taken. But these arguments go only to how much probative value the photograph had, not whether it had any relevance at all. *See id.* ("Evidence is relevant if . . . it has *any* tendency to make a [consequential] fact more or less probable than it would be without the evidence . . . ." (emphasis added)). Any danger of undue prejudice from the photograph did not substantially outweigh its probative value, *see* Fed. R. Evid. 403; the district court did not err in admitting it.

5. *Lewis's State Court Convictions on Two Prostitution-Related Charges and Evidence of Lewis's Firearm Possession*

Lewis argues that the district court erred in admitting evidence that he was arrested on and found guilty of two extrinsic prostitution-related offenses under Florida law—evidence he says was irrelevant except for the forbidden purpose of proving his bad character. But even if we assume the district court erred in admitting this evidence, Lewis cannot show that he suffered any prejudice as a result in light of the overwhelming evidence against him; any error the district court committed thus does not warrant reversal or a new trial. Lewis also argues

that the district court erred in admitting evidence that he possessed a firearm at the time he was arrested for the Florida offenses given the arrest's temporal remoteness from the timeframe charged in Count 3.  We have held similar evidence to be admissible under circumstances involving wider gaps in time than the gap at issue here.  The district court thus did not err in admitting evidence of Lewis's extrinsic gun possession.

"Evidence of a[n extrinsic] crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Such "evidence may be admissible for another purpose," such as to prove intent.  Fed. R. Evid. 404(b)(2).  Evidence is admissible under this exception if, among other things, it is "relevant to an issue other than the defendant's character."  *United States v. Matthews*, 431 F.3d 1296, 1310-11 (11th Cir. 2005) (internal quotation marks omitted).  "To establish relevance . . . where testimony is offered as proof of intent, . . . the extrinsic offense [must] require[] the same intent as the charged offense."  *United States v. Dickerson*, 248 F.3d 1036, 1047 (11th Cir. 2001) (internal quotation marks omitted).

The government argues that Lewis's 2013 arrest and convictions for the Florida prostitution offenses were relevant to prove his intent as to the § 1591(a) charges in Counts 1 and 2.  Assuming the Florida prostitution offenses did not

22

require "the same intent," *id.*, as the § 1591(a) offenses,[4] the district court's error in admitting evidence of those extrinsic offenses was harmless. Lewis fails to explain how the evidence's admission prejudiced him, nor could he plausibly do so in light of the overwhelming evidence introduced against him, so the Florida judgment's admission does not warrant reversal or a new trial.

Lewis further argues that the district court erred in admitting evidence that he possessed a firearm at the time of his arrest on the Florida prostitution offenses. Such evidence, he says, was irrelevant and unduly prejudicial given the arrest's remoteness in time from Count 3, the charged firearm offense, which occurred in 2010. Evidence of Lewis's firearm possession at the time of his arrest on the Florida charges was relevant because it tended to show that Lewis carried a firearm in connection with pimping-related activities, a fact which tends to corroborate Bertie's testimony that Lewis used a firearm to coerce her to engage in prostitution. *See* Fed. R. Evid. 401. We have approved, as proper exercises of a district court's broad discretion under the Federal Rules of Evidence, admission of extrinsic bad acts evidence of conduct or events further removed in time from

_____

[4] The Florida statutes under which Lewis had been found guilty made it unlawful "for any person with reasonable belief or knowing another person is engaged in prostitution to live or derive support or maintenance in whole or in part from what is believed to be the earnings or proceeds of such person's prostitution" and "[t]o aid, abet, or participate in" prostitution. Fla. Stat. §§ 796.05(1), 796.07(2)(h). Unlike 18 U.S.C. § 1591(a), these statutes do not require a mens rea of "know[ledge] or . . . reckless disregard of the fact, that means of force, threats of force, fraud, [enumerated types of] coercion . . . or any combination of such means will be used to cause the person to engage in a commercial sex act." 18 U.S.C. § 1591(a).

23

charged conduct than the evidence at issue here. *See, e.g.*, *United States v. Lampley*, 68 F.3d 1296, 1300 (11th Cir. 1995) (determining that the district court did not abuse its discretion under Rule 403 in admitting evidence of approximately 15-year-old marijuana transactions); *United States v. Pessefall*, 27 F.3d 511, 516 (11th Cir. 1994) ("While the extrinsic act occurred some eight years earlier than the charged crime, it is not too remote [under Rule 404(b)] in light of the government's heavy burden of proving [the defendant's] intent to conspire to possess with intent to distribute cocaine.").[5]  Any danger of unfair prejudice the firearm possession evidence posed did not substantially outweigh the evidence's probative value. *See* Fed. R. Evid. 403.  The district court thus did not err in admitting evidence of Lewis's prior firearm possession.

## D.    The District Court Appropriately Excluded Evidence and a Portion of Lewis's Opening Statement Relating to Askinazi's Prostitution History.

Lewis argues the district court violated the Confrontation Clause and abused its discretion under Rule 403 by excluding evidence—and prohibiting mention—of Askinazi's subsequent prostitution activity, which he asserts was relevant to show

---

[5] Lewis argues these cases are distinguishable because they involved "inherently unlawful" activity, whereas this case involves firearm possession, a constitutionally-protected right.  Appellant's Reply Br. at 18-19.  That distinction has no bearing on whether the firearm possession evidence was relevant to prove Lewis's intent as to Count 3.  In any event, we have never construed the Second Amendment to protect a person's prerogative to use or carry a firearm "during and in relation to any crime of violence," 18 U.S.C. § 924(c)(1)(A).

that their relationship was consensual.[6]  Such evidence had little probative value, as the activity in question occurred over a year after Lewis's indictment, and it could have been used to harass and embarrass Askinazi.  The district court did not violate the Confrontation Clause or abuse its discretion under Rule 403 in excluding evidence and prohibiting mention of Askinazi's subsequent prostitution activity.

"Trial judges retain wide latitude" under the Confrontation Clause "to impose reasonable limits on testimony based on concerns about, among other things, harassment."  *United States v. Culver*, 598 F.3d 740, 749 (11th Cir. 2010) (alterations adopted) (internal quotation marks omitted).  "Limitations on a defendant's constitutional right to present evidence are permissible unless they are arbitrary or disproportionate to the purposes they are designed to serve."  *Id.* (internal quotation marks omitted).  The "exclusion of evidence of [a witness's] prior sexual history [i]s not arbitrary or disproportionate" when "admission of such evidence would have confused the jury and harassed [the victim], and the evidence [was] marginally relevant at best."  *Id.*

Evidence that Askinazi had engaged in prostitution activity over thirteen months after Lewis's indictment was "marginally relevant at best" to whether her

---

[6] He specifically argues the district court erred in sustaining an objection to his opening statement, in which he alleged that Askinazi "had been prostituting herself like for most of her adult life" and "uses sex for drugs."  Doc. 128 at 33.

25

relationship with Lewis was coercive or consensual. *Id.* Moreover, Lewis could have used this evidence to "harass[]" and embarrass Askinazi. *Id.* Such evidence also could have "[c]ould have confused the jury," *Culver*, 598 F.3d at 749, as to which of Askinazi's prostitution activities were and were not at issue in the case. As such, the district court's exclusion of such evidence did not violate Lewis's rights under the Confrontation Clause. For the same reasons, the district court did not abuse its discretion in excluding the evidence, or in prohibiting Lewis from mentioning Askinazi's subsequent prostitution activity, based on its determination that a danger of unfair prejudice substantially outweighed any probative value that the evidence or discussion of the incident may have had. We affirm the district court's exclusion of evidence relating to, and prohibition on mentioning, Askinazi's August 2014 prostitution.[7]

---

[7] Lewis also argues that the district court erred in sustaining an objection to his cross-examination of Askinazi. At trial, the following exchange occurred:

Q. And what—are you familiar with these ads?

A. No, sir.

Q. You know about them, don't you?

A. No.

Q. No?

THE GOVERNMENT: Objection, Your Honor.

THE COURT: Sustained.

Doc. 128 at 93. Lewis says the district court sustained the government's objection because he had asked Askinazi about her August 2014 prostitution. The sequence of questioning, however, shows that the district court sustained the objection because Lewis badgered Askinazi by asking the same question three times. Lewis argues that the district court should have allowed the

**E.    The District Court Did Not Abuse Its Discretion in Denying Lewis a Continuance to Present a Witness.**

Lewis argues that the district court abused its discretion in denying his motion for a continuance of three hours and nine minutes to present Sadé Patterson as a witness.[8]  Lewis did not exercise diligence in securing Patterson's attendance, however, and his proffer as to the expected contents of her testimony was nonspecific and, even if credited, showed the testimony would have had little exculpatory value.  The district court thus did not abuse its discretion in denying Lewis's motion for a continuance.

"[C]riminal defendants must be afforded the opportunity to present evidence in their favor."  *United States v. Hurn*, 368 F.3d 1359, 1362 (11th Cir. 2004).  But this right is subject to "essential limitations" as "[t]he trial process would be a shambles if either party had an absolute right to control the time and content of his witnesses' testimony."  *Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988).  "The decision whether to continue a trial is committed to the sound discretion of the district court," based on

---

questioning to continue because Askinazi was giving false testimony, but this assertion is speculative and unsubstantiated.

[8] Lewis argues that the district court "committed fundamental error" in denying his motion for a continuance.  Appellant's Br. at 51.  We construe this as an argument that the district court abused its discretion, given that the abuse of discretion standard governs our review of a district court's denial of a motion for a continuance.  *See Cross*, 928 F.2d at 1048.

27

(1) the diligence of the defense in interviewing the witness and procuring her testimony; (2) the probability of obtaining the testimony within a reasonable time; (3) the specificity with which the defense was able to describe the witness's expected knowledge or testimony; and (4) the degree to which such testimony was expected to be favorable to the accused, and the unique or cumulative nature of the testimony.

*Cross*, 928 F.2d at 1048.

Lewis was not diligent in procuring Patterson's testimony. He informed his trial counsel that he wanted Patterson to testify at most two days before moving for a continuance,[9] and he failed to subpoena her or otherwise secure her availability.[10] *Cf. United States v. Alejandro*, 118 F.3d 1518, 1523 (11th Cir. 1997) ("If the appellant regarded [the witness's] testimony as important, due diligence required that a subpoena be issued to secure his attendance[,] . . . [and] that he ascertain whether or not the government intended to call [the witness] before the last day of a three-day trial."). Moreover, Lewis's proffer as to Patterson's expected testimony—that when she observed Lewis and Azkinasi together, Lewis never coerced Askinazi to prostitute herself, and that Askinazi seemed happy—lacked specificity, and in any event had relatively little exculpatory value. Though Lewis

---

[9] In moving for a continuance, Lewis's trial counsel represented to the district court that Lewis had only informed him that he wanted Patterson to testify that morning; Lewis contended that he brought the matter to his trial counsel's attention two days beforehand. We assume the truth of Lewis's version of the facts for the purpose of our analysis.

[10] The government named Patterson as an anticipated witness on the first day but never called her to take the stand.

28

sought only a brief continuance, we cannot say that the district court abused its discretion in denying one.

**F.     The Government's Closing Argument Did Not Prejudice Lewis's Substantial Rights.**

Lewis argues that the government made improper remarks during its closing argument that deprived him of a fair trial and thus require reversal.  To establish prosecutorial misconduct, a closing argument must, "in the context of the entire trial and in light of any curative instruction," *United States v. Chirinos*, 112 F.3d 1089, 1098 (11th Cir. 1997), (1) "be improper" and (2) "prejudicially affect the substantial rights of the defendant," *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006) (internal quotation marks omitted).  "[A]ny possible prejudice . . . resulting from the prosecutor's closing argument [is] cured by instructions from the district judge that the lawyers' arguments [are] not evidence and that the jury [is] to decide the case solely on the evidence presented at trial." *United States v. Bailey*, 123 F.3d 1381, 1402 (11th Cir. 1997).

The government's remarks during closing argument that Lewis contends were improper include its assertions that (1) Lewis's conduct fit within general pimping practices Eutsey had described, (2) Dr. Gold's testimony explained why Bertie had formed an emotional bond with Lewis, and (3) Lewis had attempted to sell an underage prostitute.  Lewis also contends that the government improperly

held up before the jury a photograph of him brandishing a firearm. We have already explained that the district court did not err in admitting Eutsey's and Gold's testimony or the photograph of Lewis brandishing a firearm. Because this evidence was properly admitted, the government did not behave improperly by referencing it in its closing remarks.

Lewis further argues that the government falsely asserted in closing that Bertie had repeatedly testified that Lewis held a gun to her head, when in fact she had testified to only one such incident. A review of the record shows that the government in fact said that Bertie had testified repeatedly about a *single* incident in which Lewis had held a gun to her, not that Lewis held a gun to her on multiple occasions. The government's statement accurately described Bertie's testimony.

Lewis also argues that the government incorrectly told the jury that it could find him guilty on Count 3 regardless of whether he brandished a firearm in trafficking Bertie. Count 3 charged Lewis with "knowingly, during and in relation to a crime of violence, us[ing] and carry[ing] a firearm and possess[ing] a firearm in furtherance of" his sex trafficking of Bertie, as well as "brandish[ing]" the firearm. Doc. 16 at 1-2; *see* 18 U.S.C. § 924(c)(1)(A). To use, carry, and possess a firearm "in furtherance of" sex trafficking, *id.*, reaches conduct beyond requiring a victim to prostitute herself at gunpoint. The government told the jury:

> I don't want you to get mistaken back there and think that he has to hold a gun to her head and say hey, go and have sex with this guy right now.

30

That's not it.  It's during the course of that he's with her, this is one of the ways that he committed the crime.

Doc. 133 at 51-52.  This statement accurately described Count 3's elements.

Finally, Lewis says the government improperly vouched for Askinazi's and Bertie's credibility, denigrated the defense's integrity, and exhorted the jurors to convict Lewis based on the government's personal opinion of his guilt.  The government's arguments in closing "were legitimate commentary in context of the evidence against [Lewis] presented at trial."  *Bailey*, 123 F.3d at 1402.  And "any possible prejudice to [Lewis] resulting from the [government's] closing argument was cured by instructions from the district judge that the lawyers' arguments were not evidence and that the jury was to decide the case solely on the evidence presented at trial."  *Id.*  Under these circumstances, Lewis cannot show that the government's closing argument prejudiced his substantial rights.

The district court committed no abuse of discretion in denying Lewis's motion for a new trial.

**G.    Lewis's Conviction for Using, Carrying, Possessing, and Brandishing a Firearm in Connection with a Crime of Violence Was Not Plainly Erroneous.**

Lewis argues that his conviction for Count 3—using, carrying, possessing, and brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (c)(3)(B)—is plainly erroneous because § 924(c)(3)(B)'s definition of a "crime of violence" did not reach his predicate sex

31

trafficking offense and is unconstitutionally vague.  Binding precedent forecloses Lewis's vagueness challenge.  Further, although that precedent introduced a new element for a conviction under § 924(c)(3)(B), and that element was not submitted to Lewis's jury, the error was harmless beyond a reasonable doubt.  We therefore affirm Lewis's conviction.

Title 18 U.S.C. § 924(c) imposes a minimum term of imprisonment of five years, to run consecutively to any other term, upon a person "who, during and in relation to any crime of violence . . . uses or carries a firearm, or . . . in furtherance of any such crime, possesses a firearm," and seven years upon one who "brandishe[s]" the firearm.  18 U.S.C. § 924(c)(1)(A)(i), (ii).  Under § 924(c)(3)(B), the term "crime of violence" encompasses "an offense that is a felony and . . . that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense."  *Id.* § 924(c)(3)(B).  In *Johnson v. United States*, the Supreme Court struck as unconstitutionally vague a similar definition contained in a similar statute, the Armed Career Criminal Act, 18 U.S.C. § 924(e).  *Johnson*, 135 S. Ct. 2551, 2563 (2015).  Lewis argues that, under *Johnson*, § 924(c)(3)(B)'s definition is unconstitutionally vague.  In *Ovalles v. United States*, however, this Court sitting en banc upheld § 924(c)(3)(B) against a vagueness challenge by concluding that its text "prescribes a conduct-based approach, pursuant to which the crime-of-

32

violence determination should be made by reference to the actual facts and circumstances underlying a defendant's offense." *Ovalles v. United States*, 905 F.3d 1231, 1234 (11th Cir. 2018) (en banc). Under this conduct-based approach, the defendant must admit, or the jury must find beyond a reasonable doubt, that the defendant's actual conduct "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 924(c)(3)(B); *see Ovalles*, 905 F.3d at 1250 & n.8.

Although Lewis's vagueness challenge fails under *Ovalles*, we must inquire further because the en banc court overruled our prior panel precedent, which had required that we take a categorical approach to the "crime of violence" definition in § 924(c)(3)(B). *See id.* at 1252. At the time of Lewis's jury trial, it was this categorical, not the conduct-based, approach that applied. Accordingly, the district court did not submit to the jury the question of whether Lewis's conduct satisfied the "crime of violence" definition. We now know from *Ovalles* that the district court's failure to do so was plainly erroneous. But that does not end our inquiry. If the government can prove, beyond a reasonable doubt, that Lewis's actual offense conduct satisfied § 924(c)'s risk standard, then the error was harmless. *See Fulminante*, 499 U.S. at 295-96; *see also Neder v. United States*, 527 U.S. 1, 9-10 (1999) (explaining that "an instruction that omits an element of the offense does

33

not *necessarily* render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence," provided the error was harmless).

The government has satisfied its burden to show harmless error.[11]  As we explained above, the government's evidence established that when Bertie disobeyed Lewis, he would choke her and pull her hair.  Once, when Bertie attempted to escape from Lewis's house, Lewis choked her, threatened to cut and kill her, hit her on the head with a gun, and pointed the gun at her face.  He also locked Bertie in the trunk of his car and threatened to kill her brother.  This is not a case in which a gun merely was present; rather, this is one in which the gun was used to effect violent force against another person.  Nor is it a case in which "the record contains evidence that could rationally lead to a contrary finding with respect to the [substantial risk] element."  *Neder*, 527 U.S. at 19.  Although defense counsel argued that Lewis did nothing more than persuade Bertie to engage in prostitution via nonviolent means, the evidence demonstrates to the contrary—that, had the jury been asked to decide whether Lewis's conduct "involve[d] a substantial risk that physical force . . . may be used," 18 U.S.C. § 924(c)(3)(B), it would have found "a very real 'risk' that physical force 'may' be used—just, as it turns out, it was," *Ovalles*, 905 F.3d at 1253.  The district court's error in failing to

---

[11] After *Ovalles* issued, we ordered the parties to file supplemental briefs on the impact of that case and whether the government could demonstrate harmless error.  The parties filed and we have considered those briefs.

instruct the jury on the "substantial risk" element therefore was harmless.  And because it was harmless, Lewis cannot show that the plain error affected his substantial rights.  *Flanders*, 752 F.3d at 1333.

We thus affirm Lewis's conviction under § 924(c).[12]

## H.    Cumulative Error Did Not Deprive Lewis of a Fair Trial.

Lewis argues that the cumulative effect of the district court's errors deprived him of a fair trial even if no error individually warrants reversal.  "Even where individual judicial errors or prosecutorial misconduct may not be sufficient to warrant reversal alone, we may consider the cumulative effects of errors to determine if the defendant has been denied a fair trial."  *United States v. Lopez*, 590 F.3d 1238, 1258 (11th Cir. 2009).  "In addressing a claim of cumulative error, we must examine the trial as a whole to determine whether the appellant was afforded a fundamentally fair trial."  *Id.* (internal quotation marks omitted).  Having determined that the district court committed only two errors—admitting evidence of Lewis's arrest on and judgment of guilt for two prostitution-related offenses and failing to instruct the jury on § 924(c)(3)(B)'s "substantial risk"

---

[12] Because we conclude that Lewis's § 1591(a) conviction falls within § 924(c)(3)(B)'s definition of "crime of violence" and that that definition is not unconstitutionally vague, we need not consider whether Lewis's § 1591(a) conviction also qualifies as a crime of violence under § 924(c)(3)(A).

35

standards—and that both errors were harmless, we conclude based on our review of the trial as a whole that cumulative error did not deny Lewis a fair trial.

## I.      The District Court Did Not Err in Sentencing Lewis.

Finally, Lewis argues that the district court erred in several respects in sentencing him.  He says the district court (1) failed to verify that his trial counsel reviewed the PSR with him, (2) conflated facts regarding Askinazi and Bertie in imposing a four-level abduction enhancement, (3) failed to calculate his sentencing range under the Sentencing Guidelines, and (4) erroneously denied his motion for substitution of counsel.  The district court acted within its discretion in denying Lewis's request for new counsel at sentencing, and any errors it committed with respect to the PSR, abduction enhancement, or guidelines range calculation were not plain or did not affect Lewis's substantial rights.  We thus affirm Lewis's sentence in all respects.

### 1.  Failure to Verify that Lewis Had Reviewed the PSR with Trial Counsel

Lewis argues that the district court erred in failing to verify at the sentencing hearing that he had reviewed the PSR with his trial counsel.  Because Lewis did not raise objections at the sentencing hearing, we review for plain error.  *Beckles*, 565 F.3d at 842.  "At sentencing, the court . . . must verify that the defendant and the defendant's attorney have read and discussed the presentence report and any addendum to the report."  Fed. R. Crim. P. 32(i)(1)(A).  There is no dispute that the

36

district court failed to verify at the sentencing hearing whether Lewis had reviewed the PSR with his trial counsel. Lewis cannot establish plain error, however, as he has failed to show that the district court's error affected his substantial rights. Lewis has neither offered meritorious PSR objections that his counsel did not raise nor shown "a reasonable probability that the court would have imposed a lower sentence" had it ascertained whether he had reviewed the PSR with counsel. *See United States v. Arias-Izquierdo*, 449 F.3d 1168, 1190 (11th Cir. 2006). For these reasons, the district court's failure to verify that Lewis had reviewed the PSR with his trial counsel does not warrant resentencing.

   2. *Erroneous Imposition of Abduction Enhancement*

Lewis argues the district court erred in imposing a sentence enhancement for abduction based on an inaccurate recollection of facts. "When the government seeks to apply an enhancement under the Sentencing Guidelines over a defendant's factual objection, it has the burden of introducing sufficient and reliable evidence to prove the necessary facts by a preponderance of the evidence." *United States v. Washington*, 714 F.3d 1358, 1361 (11th Cir. 2013) (internal quotation marks omitted). The district court imposed a four-level sentence enhancement for Lewis having abducted Askinazi. In fact, it was Bertie, not Askinazi, who testified that Lewis had abducted her. The district court plainly conflated Askinazi's and Bertie's testimonies in imposing the sentence enhancement. It is just as clear,

37

however, that its error did not affect Lewis's substantial rights. The district court said

> I can't remember them by [name] but . . . . I do consider the fact that after she escaped and was running around the streets and she was taken back to the place, that even though she did tell the police that she was fine and that she was not in danger, I believe that her testimony was very clear that she was intimidated and frightened by him and that she said that because of that. And I consider that to be an abduction.

Doc. 134 at 7-8. The district court's recollection of the trial testimony matched Bertie's description of the aftermath of her attempt to escape Lewis's custody. There can be no doubt that the district court would have imposed the same four-level enhancement had it remembered Lewis had abducted Bertie, not Askinazi. Because the district court based its decision to impose the abduction enhancement on an accurate recollection of the evidence, its misidentification of Lewis's victim does not warrant resentencing.

### 3. Failure to Calculate Guidelines Range

Lewis argues the district court erred by failing to calculate the applicable Sentencing Guidelines range prior to imposing his sentence. A district court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall v. United States*, 552 U.S. 38, 50 (2007). It commits "significant procedural error" by "failing to calculate (or improperly calculating) the Guidelines range." *Id.* at 51. Lewis did not object at the sentencing hearing, so we review for plain error only. *Beckles*, 565 F.3d at

38

842.  The record belies Lewis's claim that the district court failed to calculate his guidelines range.  At Lewis's sentencing hearing, the district court stated that it had "considered . . . the presentence report which contains the advisory guidelines" and would impose a sentence "within the advisory guideline range."  Doc. 134 at 17-18.  These statements demonstrate that the district court consciously adopted and applied the guidelines range set forth in the PSR.  It did not state a numerical guidelines range on the record at the sentencing hearing, but neither the Supreme Court nor this Court has ever held in a published decision that such an omission is erroneous.  Thus, even if the district court erred, it did not do so plainly.  *See Carpenter*, 803 F.3d at 1238-39.  And even if it plainly erred, Lewis fails to show the error affected his substantial rights:  he does not argue that the district court applied an incorrect guidelines range and offers no reason to believe his sentence would have been lower had the district court stated the proper guidelines range on the record during the sentencing hearing.  For these reasons, the district court's calculation of Lewis's guidelines range does not warrant resentencing.

### 4.  *Denial of Lewis's Request for Substitution of Counsel*

Finally, Lewis argues that the district court abused its discretion in denying his motion for substitution of counsel at his sentencing hearing.  District judges, however, have broad discretion in granting or denying such motions, and although Lewis asserts dissatisfaction with decisions his trial counsel made, he identifies no

39

fundamental problems with his trial counsel's performance that render the denial of his motion an abuse of discretion.  We thus affirm the district court.

"Although an indigent criminal defendant has a right to be represented by counsel, he does not have a right to be represented by a particular lawyer, or to demand a different appointed lawyer except for good cause."  *United States v. Young*, 482 F.2d 993, 995 (5th Cir. 1973).  "Good cause . . . means a fundamental problem, such as a conflict of interest, a complete breakdown in communication or an irreconcilable conflict which leads to an apparently unjust verdict."  *United States v. Garey*, 540 F.3d 1253, 1263 (11th Cir. 2008) (en banc) (internal quotation marks omitted).  In reviewing a district court's decision concerning a defendant's motion for new counsel, we consider "1) the timeliness of the motion; 2) the adequacy of the court's inquiry into merits of the motion; and 3) whether the conflict was so great that it resulted in a total lack of communication between the defendant and his counsel thereby preventing an adequate defense."  *Calderon*, 127 F.3d at 1343.  "Good cause for substitution of counsel cannot be determined solely according to the subjective standard of what the defendant perceives. . . . A defendant's general loss of confidence or trust in his counsel, standing alone, is not sufficient."  *Thomas v. Wainwright*, 767 F.2d 738, 742 (11th Cir. 1985) (citation omitted) (internal quotation marks omitted).  "Unless a Sixth Amendment violation is shown, whether to appoint a different lawyer for an indigent criminal defendant

40

who expresses dissatisfaction with his court-appointed counsel is a matter

committed to the sound discretion of the district court." *Young*, 482 F.2d at 995.

Lewis does not contend that his trial counsel's representation of him created

a conflict of interest or resulted in a "complete breakdown in communication."

*Garey*, 540 F.3d at 1263.  Instead, he alleges that his trial counsel failed to (1)

ensure Lewis's participation in the presentencing investigation or review the PSR

with him, (2) correct the district court's conflation of facts regarding Askinazi and

Bertie when the court imposed the abduction enhancement, or (3) challenge

various rulings the district court made.[13]  None of these purported deficiencies rises

_____

[13] Lewis asserts that other unspecified conflicts also impeded his ability to communicate with his trial counsel and prepare for the sentencing hearing, but he does not explain the nature of these supposed conflicts.  "Abandonment of an issue can . . . occur when passing references appear in the argument section of an opening brief" as "mere background to the appellant's main arguments or when they are buried within those arguments." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 682 (11th Cir. 2014) (internal quotation marks omitted).  Lewis's "passing references" to unspecified conflicts with his trial counsel are "mere background to" and "buried within" his "main arguments" that his trial counsel did not ensure his participation in the presentencing investigation, review the PSR with him, or correct the district court's conflation of facts with respect to Askinazi and Bertie in imposing the abduction enhancement—they amount to "nothing more than conclusory assertions." *Id.*  Lewis thus abandoned any argument he may have had with respect to these unspecified alleged conflicts.

Additionally, Lewis argues, for the first time on appeal in his reply brief, that his trial counsel failed to challenge at sentencing: (1) the admission of a written statement by Askinazi—whose absence the government did not explain—which deprived Lewis of an opportunity for cross-examination, as well as (2) the imposition of a seven-year sentence on Count 3 on the ground that § 924(c)(3)(B) does not reach his sex trafficking offense and is unconstitutional.  "We decline to address an argument advanced by an appellant for the first time in a reply brief." *Big Top Koolers, Inc. v. Circus-Man Snacks, Inc.*, 528 F.3d 839, 844 (11th Cir. 2008).  Moreover, Lewis has abandoned his argument as to the written statement Askinazi submitted by offering mere "passing references" to it, *Sapuppo*, 739 F.3d at 682, and cannot show prejudice from his trial counsel's failure to challenge his sentence under Count 3, as those arguments are without merit for reasons we have explained, *see supra* Part III.G.

to the level of "an irreconcilable conflict," much less one "which leads to an apparently unjust verdict." *Id.* And, as we have already explained, neither the trial counsel's failure to review the PSR with Lewis or correct the district court's conflation of facts affected Lewis's sentence. Though it is undisputed that Lewis timely moved for substitution of counsel, it is also undisputed that "the district judge heard the reasons for [Lewis's] dissatisfaction with trial counsel before ruling on the motion." *Calderon*, 127 F.3d at 1343. The district judge reviewed multiple filings in which Lewis expressed grievances with his trial counsel and invited Lewis to reargue the issue at sentencing. Given these considerations, we cannot say the district court abused its discretion in denying Lewis's motion for substitution of counsel.

## IV.   CONCLUSION

We affirm Lewis's convictions and sentence in all respects.

**AFFIRMED.**

42